# Richmond

## Jennie Mae Garner DeRyder v. Metropolitan Life Insurance Company.

November 29, 1965.

Record No. 6031.

Present, All the Justices.

*Howard I. Legum* and *Morris H. Fine* (*Fine, Fine, Legum, Schwan & Fine*, on brief), for the plaintiff in error.

*Granger West* (*Ford, West & Wilkinson*, on brief), for the defendant in error.

SNEAD, J., delivered the opinion of the court.

On January 13, 1960, Jennie Mae Garner DeRyder, plaintiff, hereinafter sometimes referred to as Jennie, filed a motion for judgment in the Circuit Court of the City of Hampton seeking damages in the sum of $11,000 against Metropolitan Life Insurance Company, defendant. The motion alleged, *inter alia*, that plaintiff was the beneficiary of a certain policy of life insurance issued by defendant on the life of Leonard Joseph DeRyder, decedent, and that defendant had wrongfully paid the proceeds of the policy to someone other than plaintiff. Upon petition of defendant the case was transferred to the United States District Court for the Eastern District of Virginia. Later, that court remanded the case to the Circuit Court of the City of Hampton because it lacked jurisdiction.

A trial was had, and defendant moved the court to strike plaintiff's evidence at the conclusion thereof. The court stated that it would withhold its ruling on the motion. Whereupon, defendant offered no evidence, rested its case and renewed its motion to strike. Plaintiff's motion for summary judgment was overruled, and the court struck plaintiff's evidence and entered summary judgment for defendant. We granted plaintiff a writ of error.

The record discloses that Leonard Joseph DeRyder, the insured, died in Hampton, Virginia on November 17, 1958. At the time of his death an insurance policy was in effect upon his life in the sum

of $5,000. This policy had been issued by defendant pursuant to the provisions of the Federal Employee's Group Life Insurance Act, 5 U.S.C.A., §§ 2091 *et seq.* and provided that if, at the death of the insured, there was no designated beneficiary, the proceeds of the policy would be payable to the insured's widow. Decedent had not designated a beneficiary at the time of his death.

On December 1, 1958, Nannette O. DeRyder, hereinafter sometimes referred to as Nannette, filed a written claim with defendant for death benefits under the policy. On the application form Nannette stated that she and DeRyder were married on May 8, 1923, in Elizabeth City, North Carolina. She further stated that she and DeRyder had each been married only one time. All of these statements were subsequently proven to be false. Pursuant to the claim, defendant paid the $5,000 proceeds of the policy to Nannette as decedent's lawful widow. Sometime thereafter, Jennie DeRyder, the plaintiff, claimed that she was DeRyder's lawful widow and entitled to receive the proceeds of the policy. Upon defendant's refusal to honor her claim she instituted this action.

Jennie DeRyder testified that her first marriage was to Henry A. Cross; that this marriage was annulled on June 6, 1924; that she met decedent in 1923, and that she married him on September 24, 1924 in Newburgh (Orange county), New York. Except for a three-month period in 1925, the couple lived in Orange county, New York until 1930. Decedent left Jennie "one time in 1929", but was "picked up" and returned to Newburgh pursuant to an indictment charging him with abandonment and nonsupport of a minor child born of this union. In 1930 DeRyder left Jennie and never lived with her again. Jennie continued to live in Orange county, New York and was living there at the time of the trial.

Jennie further testified that about six or seven months after decedent left her permanently in 1930 she received a newspaper clipping through the mail from an anonymous source which stated that DeRyder had drowned while swimming. At first she did not think that the information contained in the clipping was correct, but after "some years went by" she believed that decedent was dead. However, she did not preserve the news article, and she never obtained any other information to substantiate it. On June 14, 1941, she married a man named Bulson.

In April, 1945, DeRyder, accompanied by Nannette, visited Jennie at her home in New York. (DeRyder and Nannette were not married at the time.) Jennie testified that she was not introduced

to Nannette as Mrs. Bulson and that Nannette was not introduced to her as DeRyder's wife. She said "There was no introduction whatsoever, not by any last names. There were no last names mentioned. It was Jennie and Nannette." However, she also said: "That was Nannette and she was expecting at that time. So I knew it must have been his wife or something, or I don't know what it was." She further testified that this was the first time that she had seen DeRyder since he left her in 1930; that it was the first time since receiving the news clipping that she knew him to be alive, and that she did not do anything about her marriage to Bulson after learning that DeRyder was alive because "it was too late." Bulson died sometime after DeRyder and Nannette visited Jennie, but Jennie continued to go by the name of Mrs. Bulson up to the time of trial.

Nannette DeRyder was called by plaintiff as an adverse witness. Her testimony may be summarized as follows: She first became acquainted with DeRyder at Norfolk, Virginia in 1919. In September, 1923, DeRyder went to New York where he remained until 1930. During his stay there (while living with Jennie) he mailed birthday, Christmas, and Easter cards to her. On March 29, 1927, she (Nannette) married Edward Wells in Norfolk. They separated in 1929, and in 1936 Wells died.

DeRyder returned to Norfolk in 1930 after leaving Jennie, and in May, 1933, three years before the death of Wells, he began living with Nannette. He and Nannette remained in Norfolk until August, 1934 when they moved to Hampton. They lived together in Hampton until December, 1942, when DeRyder joined the Seabees, a branch of the U. S. Navy. His first tour of duty was at Camp Peary, which is in York county near Williamsburg. He remained at Camp Peary from December, 1942 until the early spring of 1943 when he contracted pneumonia and was sent to the naval hospital at Portsmouth. DeRyder was a patient in the hospital for about a month and then was sent to Rhode Island where he remained until July. He was then transferred to California where he remained until October, at which time he was sent "[s]omewhere in the South Pacific." There he remained until he was returned to the United States on March 23, 1945. DeRyder was then stationed at Charleston, South Carolina until June 19, 1945, when he was discharged from military service. After his discharge he returned to Hampton, Virginia and lived there continuously with Nannette until his death in 1958.

Nannette further testified that she and DeRyder were married on May 8, 1945, in South Mills, North Carolina, about a month before his discharge from the Seabees. When asked why she falsely listed the date and place of the marriage as May 8, 1923, in Elizabeth City, North Carolina on the claim for death benefits she explained that DeRyder had told her to do so "for his children." She stated that she did not know until 1929 that decedent had previously been married to Jennie DeRyder, the plaintiff; that in 1933 DeRyder told her that "he was going to get a divorce and I thought he got a divorce"; and that while he was in the Seabees he again told her that he was going to apply for a divorce, "but he never did say whether he got it or not."

Jennie stated that she never filed a suit for divorce against DeRyder in the state of New York or in any other place. She introduced in evidence the deposition of the clerk of the New York Supreme Court in and for the county of Orange to show that no decree of divorce, annulment, or other dissolution of marriage had been entered between the parties in Orange county. Defendant admitted in its response to plaintiff's request for admissions that there was no record of any divorce proceeding involving DeRyder and plaintiff ever being filed in the courts of Elizabeth City county[1], Hampton, or Norfolk, Virginia.

In her assignments of error plaintiff contends that the court erred (1) in striking her evidence and entering summary judgment for defendant, (2) in denying her motion for summary judgment, and (3) in refusing to sustain her motion to strike certain answers made by defendant in response to her request for admissions.

Plaintiff argues that it was impossible for decedent to have obtained a divorce in any of the places where he was stationed while on military duty during World War II. She further argues that Orange county, New York, was the only place where she and decedent cohabited and that Norfolk, Hampton, and Elizabeth City county, Virginia were the only places where decedent resided. Thus, she contends, because the evidence showed that no divorce decree was entered in any of these places, she was entitled to summary judgment as a matter of law, or, in the alternative, to have the case submitted to the jury.

Defendant, on the other hand, says that it was possible for decedent to have obtained a divorce in some of the places where he resided

---

[1] Elizabeth City county was consolidated with the city of Hampton on July 1, 1952.

after his marriage to plaintiff; that the burden was upon plaintiff to show that decendent did not in fact obtain a divorce in any of these places; and that plaintiff did not carry her burden when she failed to eliminate the York county, James City county and Williamsburg area together with the South Pacific as locations where a divorce decree could have been entered against her.

*Parker* v. *American Lbr. Corp.*, 190 Va. 181, 56 S. E. 2d 214, involved the question of whether Parker's first wife or his second wife, both living, was entitled to an award by the Industrial Commission as a result of a fatal injury suffered by Parker arising out of the course of his employment. The crucial issue was whether the first wife had rebutted the presumption that Parker's second marriage was valid and that his first marriage had been dissolved by divorce. We held that the evidence was not conflicting; that it was insufficient to support the Commission's finding that Parker's marriage to his second wife was bigamous and void, and that the first wife was not entitled to compensation. Mr. Justice Buchanan, speaking for the court, said:

"The decided weight of authority, and we think the correct view, is that where two marriages of the same person are shown, the second marriage is presumed to be valid; that such presumption is stronger than and overcomes the presumption of the continuance of the first marriage, so that a person who attacks a second marriage has the burden of producing evidence of its invalidity. Where both parties to the first marriage are shown to be living at the time of the second marriage, it is presumed in favor of the second marriage that the first was dissolved by divorce. These presumptions arise, it is said, because the law presumes morality and legitimacy, not immorality and bastardy. 55 C.J.S., Marriage, sec. 43c(3), p. 893; 35 Am. Jur., Marriage, sec. 195, p. 306; Annotations, 34 A.L.R. 464, at p. 476, 77 A.L.R. 729, at p. 736; *Pittinger* v. *Pittinger*, 28 Colo. 308, 64 P. 195, 89 Am. St. Rep. 193, and note at p. 198.

"The cases are not entirely in harmony as to the force and effect to be given to the presumption in favor of the validity of the second marriage. Generally, it is said to be a strong presumption but one that may be rebutted by evidence of invalidating facts. In 55 C.J.S., *supra*, Marriage, sec. 45e, p. 918, many cases are cited in support of the statement that in order to overcome this presumption of validity, 'the evidence must be strong, distinct, satisfactory and conclusive.' A less stringent and, as we think, a more logical and better

supported rule is this, from the case of *Brokeshoulder* v. *Broke-shoulder*, 84 Okla. 249, 204 P. 284, 34 A.L.R. 441, at p. 452.

" 'The presumption arising in favor of the validity of a second marriage is not a conclusive presumption, but is what is known as a "rebuttable presumption", and the one contending against the legality of the second marriage is not required to make plenary proof of a negative averment. It is enough that he introduce such evidence as, in the absence of all counter testimony, will afford reasonable grounds for presuming that the allegation is true, and when it is done the *onus probandi* will be thrown on his adversary.' (Citing cases and authorities.)

"But 'where the presumption of law is a true rule of law assigning a *prima facie* force to an inference of fact, i.e., is properly a presumption of law, the basic inference of fact at all times remains to exert its full logical effect in the case.' Chamberlayne, Modern Law of Evidence, vol. 2, section 1083, p. 1326." 190 Va. pp. 185, 186.

Tested by these principles, the evidence does not sufficiently rebut the strong presumption that DeRyder's second marriage to Nannette was valid and that his first marriage to plaintiff was dissolved by divorce. It falls short of establishing reasonable grounds for presuming that the marriage was invalid so as to cast the *onus probandi* upon defendant.

The record shows that DeRyder told Nannette in 1933 that he was going to get a divorce from Jennie and that Nannette thought he had obtained it. Later, while in the Seabees and before he married Nannette, he again told her that he was going to secure a divorce. Prior to DeRyder's marriage to Nannette on May 8, 1945, Jennie married a man by the name of Bulson and continued to live with him and go by his name after she knew that DeRyder was alive. She was asked:

"Q. You go by the name of Mrs. Bulson. Is that name so known by your neighbors and anyone else?

"A. Yes.

"Q. Why don't you call yourself Mrs. Jennie DeRyder?

"A. I have no reason to.

"Q. You did as plaintiff in this case?

"A. Yes, but at the time I had taken the name of Bulson I knew nothing about this.

"Q. You knew about it long before Mr. Bulson died, didn't you?

"A. No, I did not. Not about anything concerning any money or anything."

While Jennie did testify that she never instituted a suit for divorce against DeRyder, she did not state that process was not served upon her either personally or by order of publication in a divorce proceeding instituted by him. During the 13 years that DeRyder was married to Nannette, Jennie remained silent. She made no claim that she was DeRyder's lawful wife until after his death when she had learned of the insurance benefits.

The record further shows that when DeRyder entered the Seabees at Camp Peary, located in York county near Williamsburg, in December, 1942, he had not married Nannette. Unquestionably, at that time he was domiciled in, and was and had been an actual bona fide resident of this State for at least the preceding year, as required by Code, § 5105 (now § 20-97) in order to maintain a suit for divorce.

The record does not show whether he resided at the camp in York county, or nearby in James City county, or in the city of Williamsburg during the several months he was assigned to the camp. Plaintiff offered no evidence to show that a divorce was not obtained in any of these places and contents herself with saying that it was impossible for DeRyder to have secured a divorce while assigned to Camp Peary. We do not agree with that conclusion. DeRyder could have established a legal residence in any one of the stated places, and under the provisions of § 5105 (now § 20-98) he could have instituted suit and obtained a divorce since his wife, Jennie, was a nonresident of this State. In the view we take of the case, it becomes unnecessary to discuss defendant's contention that DeRyder could have obtained a divorce during the period of approximately a year and a half when he was "[s]omewhere in the South Pacific." We hold that the trial court did not err in striking plaintiff's evidence and in entering summary judgment for defendant.

■ Finally, plaintiff contends that the court erred in refusing to sustain her motion to strike certain answers made by defendant in response to her request for admissions. The record shows that before the case came to trial plaintiff caused a written request for admissions to be served upon defendant pursuant to Code, § 8-111.1. Forty matters of fact were set forth in this request, and defendant was asked to admit the truth of each statement. Defendant filed a response made under oath which admitted the truth of some of the statements but as to a number of them the reply was in these words: "The fact requested to be admitted is not within the knowledge of the defendant." Written objections were also filed by defendant to two requests for admissions on the ground that the requests were irrelevant.

Plaintiff subsequently filed a motion to strike those answers of defendant which stated that the fact requested to be admitted was not within its knowledge. She prayed that the court enter an order ruling either that the requests "stand admitted" or that defendant be required to answer in accordance with the statute. The motion to strike was overruled, and by the same order the court ruled that the requests for admissions to which defendant filed objections and did not answer were irrelevant. No error was assigned to the ruling on objections.

Code, § 8-111.1, *supra*, provides in part:

"* * * Each of the matters of which an admission is requested shall be deemed admitted unless * * * the party to whom the request is directed serves upon the party requesting the admission either (1) a sworn statement denying specifically the matters of which an admission is requested or *setting forth in detail the reasons why he cannot truthfully admit or deny those matters* or (2) written objections on the ground that some or all of the requested admissions are privileged or irrelevant or that the request is otherwise improper in whole or in part, * * *." (Italics supplied.)

Plaintiff argues that defendant's answers did not comply with the requirements of Code, § 8-111.1, *supra*, because they did not give the reasons why the matters could not be admitted. She further argues that after the case was removed to the United States District Court for the Eastern District of Virginia Nannette DeRyder testified by way of discovery deposition as to each of the facts requested to be admitted and that defendant had ample time to investigate the truth of Nannette's testimony.

Defendant, on the other hand, contends that its answers to the requests for admissions fully complied with the statute and denies that Nannette testified in the discovery deposition "to each of the facts requested to be admitted." Defendant points out a number of the requests for admissions which, it says, were not testified to by Nannette nor within her knowledge. In any event, the discovery deposition was not made a part of the record in this case.

In *Fire Assurance Corp.* v. *Cohen*, 203 Va. 810, 813, 127 S.E. 2d 399, we said:

"The procedure dealing with requests for admissions is not to be used to cover the entire case and every item of evidence, but to force admissions of facts about which there is no real dispute. (Citing cases and authorities.)

"The purpose of statutes and rules of procedure providing for admissions is to eliminate those facts which will not be disputed at the trial or about which there is no real controversy, to relieve the parties of the burden of proving them, to expedite the trial, and to facilitate a proper decision on the merits." (Citing cases and authorities.)

The decisions are split as to whether a party should be required to admit or deny facts which are not within his knowledge. Some courts have held that a party is not compelled to admit or deny such facts. Other courts have ruled that where a proper request for admissions is made under Rule 36 of the Federal Rules of Civil Procedure (identical to § 8-111.1) a party is required to answer even though he has no personal knowledge of the matter requested to be admitted, "if the means of information are reasonably within his power." A slight majority of the decisions supports the latter view, and we think that it represents the proper view in the light of the purpose of the rule and statute. See 4 Moore's Fed. Prac., sec., ed. par. 36.04, pp. 2712, 2713, and cases there cited.

It would unduly prolong this opinion and serve no useful purpose to discuss each of the 28 matters requested to be admitted to which defendant responded that the fact requested to be admitted was not within its knowledge. Suffice it to say that some of these requests required answers that were unknown to defendant but were within the knowledge of the decedent, or plaintiff, or Nannette, who was not a party to this action. Plaintiff's requests for admissions Nos. 29 and 30 follow:

"29. Plaintiff never filed a divorce suit or annulment suit against the decedent.

"30. Decedent never filed a suit for divorce or annulment against plaintiff."

It is manifest that if defendant had been required to admit the truth of these matters it would have admitted the ultimate fact in issue, viz: whether or not DeRyder's marriage to plaintiff had been dissolved by divorce, and there would have been no need for this litigation. "[I]t was not the intention of the legislature that § 8-111.1 was to be used to obtain admissions of controverted facts." *Fire Assurance Corp.* v. *Cohen, supra,* 203 Va. at p. 813.

Upon a reading of the requests for admissions in dispute we are convinced that it would have worked an undue hardship upon defendant to have required it to obtain the information it needed in order to admit or deny the requests. The "means of information" were

not *reasonably* within its power. In effect, plaintiff was asking defendant to prove her case rather than to eliminate those facts which would not be disputed at the trial. Under the facts and circumstances of this case, defendant's response was sufficient.

We hold that the trial court was correct in refusing to strike defendant's answers.

For the reasons stated, the judgment appealed from is

*Affirmed.*