**Nancy Anne HEWITT etc.**

v.

**FIRESTONE TIRE AND RUBBER COMPANY.**

**Civ. A. No. 79–0267–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

June 10, 1980.

Robert L. Harris, James S. Gilmore, III, Richmond, Va., for plaintiff.

William H. King, Jr., William H. Robinson, Jr., Clinton W. Calhoun, Richmond, Va., for defendants.

## MEMORANDUM

WARRINER, District Judge.

This diversity action is before the Court for approval of a settlement pursuant to Virginia's Death by Wrongful Act, Va.Code § 8.01–55 (Repl.1977). Two questions are raised. The first requires the Court to determine which of two claimants is the decedent's surviving spouse. The second, which in part is dependent upon the first, requires the Court to determine whether the amount of the settlement is fair and just and, if so, how the settlement funds should be distributed and apportioned among the several beneficiaries.

### I

On 14 June 1966 John Carthel Hewitt, a twenty year old soldier in the United States Army, married Barbara Anne Cullum, also twenty, in Texas. John and Barbara resided together as husband and wife through December, 1966, but thereafter were separated when John was confined in a penitentiary. During the term of his confinement, one year, John saw his wife infrequently and otherwise communicated with her only by mail.

Upon his release from prison in December 1967 John was sent to South Vietnam by the Army. He returned to the United States on thirty days' leave in March of 1968, and spent that leave with his wife in Paris, Texas. During this time John and

Barbara's first child was conceived; John Carthel Hewitt, Jr., was born on 27 November 1968.

John returned to South Vietnam in April 1968 and remained there until a new duty assignment in January 1969 brought him stateside. John and Barbara lived together in Aberdeen, Maryland, from March 1969 until August 1969, when they returned to Texas. The couple stayed in Texas until September 1969 when John suddenly deserted his wife and family. When John left Barbara she was several months pregnant with their second child, Larry Dwayne Hewitt, who subsequently was born on 3 March 1970.

Barbara next heard from John in December 1969 when he telephoned from an unspecified location. In this conversation John stated that he cared for Barbara but that he would not return home. John further told Barbara, falsely, that financial support would be forthcoming. Neither Barbara Hewitt nor any of her children ever received financial support, emotional support, or any other form of support from John after September 1969.

The last time Barbara talked to John was in August of 1973 when she called him about a divorce.[1] In the course of the telephone call, John, according to Barbara, assented to a divorce. John allegedly told Barbara to have a lawyer "draw up the papers" and send them to him. He said he would then "sign the papers" and return

them to the lawyer with his fee. Barbara stated that she saw a lawyer, that the lawyer drafted pleadings and mailed them to John, but that John never returned either the papers or the fee. Barbara could not recall the name or location of the office of the attorney she purportedly visited.

In October 1969 John had met Nancy Anne Threatt. She was single, twenty-four years old, living and working in Aberdeen, Maryland. On 26 December 1969, after a brief courtship, John and Nancy were married in Fayetteville, North Carolina, at the home of Nancy's parents. Nancy and her parents were aware of John's previous marriage and of his child, John, Jr. John represented to Nancy and her family, however, that his first marriage had ended in divorce. Nancy Threatt married John in good faith, unaware of any legal impediment that prohibited John from entering a second marriage.[2]

John and Nancy lived together continuously from the time of their marriage until John's death some eight years later. They lived first in Aberdeen, Maryland, and then in Hopewell, Virginia. They had three children. Ronald Wayne Hewitt was born sometime in 1972, William David Hewitt in July 1973. A third child died of accidental drowning. Although the first years of the marriage were trying, in time the relationship grew secure and John proved to be an attentive, faithful, and devoted husband and father. He provided well for his family

---

1. Barbara testified that John visited her in Texas for a week in July of 1971. She said he stayed in a motel but spent almost every day with her. She claimed frequent sexual intercourse during this visit, thus explaining the birth of a premature child the following January or late December. The claim of John's visit was corroborated by Barbara's sister, Mrs. Morgan, who stated in support of Barbara's application for Social Security benefits, that she "recognized" John's car in front of the motel during his alleged visit. In court Mrs. Morgan admitted she had no way to recognize John's car and that Barbara had merely pointed to a car with a Maryland license plate and told her it was John's. Nancy Hewitt, John's second wife, testified that John did not visit Texas in July of 1971, that during this period he was in construction work in Maryland and was not away from her for as much as twenty-four

hours. The Court concludes that John did not visit Barbara in July of 1971.

2. The Court infers that John's presentation of himself as divorced was thoroughly convincing; no effort was made by him to conceal his second marriage or to deny his first marriage. A marriage license was obtained from the Register of Deeds in Fayetteville in the proper names of the parties. The wedding ceremony was not surreptitious but was, instead, attended by the bride's family in her father's home. Some 200 guests attended the wedding reception. Nancy's father, Mr. Threatt, a responsible member of the Fayetteville community, entertained doubts about the suitability of John as a husband for his daughter; nevertheless, he gave his assent and blessing to the marriage. His doubts were not based on any suspicion of bigamy.

out of his earnings as an over-the-road truck driver.

On 17 November 1977 John Carthel Hewitt was killed when his tractor-trailer truck left the road and overturned near Woodbrudge, Virginia, in Prince William County. At the time of his death John Hewitt was thirty-one years of age, in good health, and gainfully employed as a truck driver by Great Coastal Transport Corporation, a trucking concern located in Richmond, Virginia.

Barbara learned of John's death and immediately, within a month, filed an application for social security benefits as his widow. Cognizant of John Hewitt's later marriage to Nancy, the Social Security Administration sought information as to the existence of a decree of divorce dissolving the marriage of John and Barbara Hewitt. No decree was located. On this basis, the Administration awarded widow's, as well as surviving children's benefits, to Barbara Hewitt and her family. She currently receives $823.00 per month in social security benefits.

In March 1979 suit for damages for the wrongful death of John Carthel Hewitt was commenced in this Court. The complaint was filed by Nancy Anne Hewitt and Jerome L. Lonnes as co-administrators of the Estate of John Carthel Hewitt. After extensive discovery and negotiations the parties reached a settlement. Pursuant to Virginia statute, the parties tendered the terms of the settlement to the Court for its approval. Va.Code § 8.01–55 (Repl.1977). By its terms, the defendant Firestone Tire and Rubber Company, while denying liability agreed to pay $400,000 to the administrators for a release of all claims against Firestone arising from John's death.

After reaching and submitting the settlement to the Court, counsel for the co-administrators learned and informed the Court about John's earlier marriage to Barbara and of his children by that marriage. Thus advised that there might be conflicting claimants to the settlement proceeds, the Court appointed guardians *ad litem* for the two sets of children, ordered notice by publication, and set the matter for an evidentiary hearing to determine the rightful beneficiaries, the propriety of the settlement, and the fair distribution of the funds. The $400,000 previously placed in the registry of the Court was deposited into an interest-bearing account.

A hearing was held on 31 March 1980. All parties were represented by counsel except Nancy Hewitt in her individual capacity. All parties, including Nancy, sought approval of the $400,000 settlement notwithstanding the existence of the additional claimants not contemplated when the settlement was reached. The parties also sought a judicial determination of the rightful beneficiaries and how the settlement funds should be distributed.

## II

Virginia's Death by Wrongful Act statute, a direct descendant of Lord Campbell's Act, provides that damages shall be distributed to "the surviving spouse . . . [and] children of the deceased . . . ." Va.Code § 8.01–53 (Supp.1979).[3] This statute serves also as a guide for a court disbursing funds after a claim for death by wrongful act is compromised. Va.Code § 8.01–55 (Repl. vol. 1977). The classes of beneficiaries named in the statute are exclusive; a court is not at liberty to consider additional or alternative beneficiaries. *Matthews v. Hicks*, 197 Va. 112, 120, 87 S.E.2d 629, 634 (1955); *Porter v. Virginia Electric & Power Co.*, 183 Va. 108, 113, 31 S.E.2d 337, 339 (1944).

In the case at bar two women, Barbara Hewitt and Nancy Hewitt, claim to be the surviving spouse of John Carthel Hewitt. Both cannot be. *See Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1879); Va.Code § 20–38.1 (Supp.1979). Accordingly, the Court must determine which of the two claimants is the surviving spouse and rightful beneficiary.

---

**3.** The legislative history of the Virginia wrongful death statutes is set out in *Hudson Motor Car Co. v. Hertz*, 121 F.2d 326 (6th Cir.), cert. denied, 314 U.S. 696, 62 S.Ct. 413, 86 L.Ed. 557 (1941). *See also Wilson v. Whittaker*, 207 Va. 1032, 154 S.E.2d 124 (1967).

In Virginia, as in most jurisdictions, a presumption exists that a marriage last-in-time is valid, and that any prior marriage was terminated by death or divorce.[4] This presumption is strong but rebuttable. While the party challenging the legality of the second union need not "make plenary proof of a negative averment," he must, in order to shift the burden, introduce such evidence as, in the absence of all counter testimony, will afford reasonable grounds for presuming that the former marriage was not dissolved. *De Ryder v. Metropolitan Life Insurance Co.*, 206 Va. 602, 607–08, 145 S.E.2d 177, 181 (1965); *Parker v. American Lumber Corp.*, 190 Va. 181, 186, 56 S.E.2d 214, 216 (1949).[5]

In an effort to rebut the presumption favoring the validity of John Hewitt's second marriage, Barbara Hewitt makes two factual arguments. Barbara states, first, that she talked to John about a divorce in 1973—four years after his marriage to Nancy. Barbara asserts that during a telephone conversation John assented to a divorce, and instructed Barbara to have a lawyer "draw up the papers" and forward them to him. Barbara has testified that in fact she saw a lawyer and that the lawyer drafted divorce papers and mailed them to John. The implication is that John, by agreeing to a divorce, recognized that he

was still married to Barbara—and thus that his second marriage was bigamous and void.

The Court acknowledges that recognition of a continuing marriage by both parties thereto, subsequent to a second marriage by one of the parties, may amount to evidence sufficient to overcome the presumption that the first marriage was terminated. *E. g., Jones v. Case*, 266 Ala. 498, 97 So.2d 816 (1957); *Travelers Insurance Co. v. Lester*, 73 Ga.App. 465, 36 S.E.2d 880 (1946).[6] Indeed, if the Court had evidence which would lend credibility to Barbara's testimony about the 1973 phone call, the Court might conclude that the presumption had been rebutted and the burden transferred. But no evidence is before the Court which corroborates Barbara's claim.[7] Barbara testified that she saw a lawyer about a divorce, and that he prepared divorce papers. Barbara, however, is unable to remember the lawyer's name, or the location of his office.[8] She did not produce the papers or copies of them. She had not re-contacted the lawyer for his corroborative evidence. The Court cannot be persuaded by the uncorroborated, though easily corroborated, testimony of interested witnesses who make claims that are practically incapable of contradiction.

The second point made by Barbara to rebut the presumption of the validity of the

---

**4.** Rule 302 of the Federal Rules of Evidence provides that "[i]n civil actions and proceedings, the effect of a presumption respecting a fact which is an element of a claim or defense as to which State law supplies the rule of decision is determined in accordance with State law." Fed.R.Evid. 302. This Rule is an outgrowth of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**5.** *Parker* and *De Ryder* are the leading cases in Virginia for the principles stated in text. The *Parker* case prompted a helpful annotation, Annot., 14 A.L.R.2d 7 (1950). The *De Ryder* case is discussed in 7 Wm. & Mary L.Rev. 403 (1966).

**6.** Still more persuasive is evidence of a divorce between the parties to a first marriage obtained after a second marriage by one of those parties. *E. g., Fowler v. Fowler*, 96 N.H. 494, 79 A.2d 24 (1951); *Carter v. Graves*, 206 Ga. 234, 56 S.E.2d 917 (1949); *Sloan v. West*, 50 Wash. 86, 96 P. 684 (1908); *Schmisseur v. Beatrie*, 147 Ill. 210, 35 N.E. 525 (1893).

**7.** Barbara's testimony about contacting a lawyer was tracked by the testimony of her brother-in-law. His testimony suffers from the same infirmities as Barbara's.

**8.** Barbara was living in Paris, Texas, a rural town located approximately one hundred miles northeast of Dallas, when allegedly she saw an attorney about a divorce from John. Assuming she called on a local attorney—an assumption that admittedly may be inaccurate—the Court has difficulty understanding why that attorney cannot be identified. Paris, Texas, presently supports but three law firms, consisting of a total of seven lawyers. VI Martindale-Hubell Law Dictionary (1980). If the bar of Paris has enjoyed *any* growth in recent years, one must accept that the number of lawyers practicing there in 1973 was small indeed, and that the names of those lawyers are readily ascertainable.

second marriage is that John *could not* have obtained a divorce during the three months that lapsed from September 1969, when he left Barbara, to December, 1969, when he married Nancy. This claim cannot be supported. Divorce laws existing in the fifty States in 1969 demonstrate that John could have obtained an *ex parte* divorce in at least six jurisdictions, including Texas.[9] The possibility of a foreign divorce, though not decisive here, also must be acknowledged.[10] Counsel for Barbara, however, in their efforts to rebut the presumption, have failed to come forward with any documentary evidence from any jurisdiction which establishes that no divorce decree was entered dissolving the marriage of John and Barbara Hewitt.[11]

Counsel for Barbara explain their failure to offer any documentary evidence of the absence of a divorce by arguing that a litigant seeking to overcome the presumption favoring the validity of the second marriage "is not put to the test of proving a negative." Counsel argue, further, that the presumption favoring the second marriage is "simply a rule of evidence" that may be rebutted by a showing of little more than the legality of the first marriage. Because this Court believes that the positions ad-

9. The 1969 residency requirements for an *ex parte* divorce demonstrate that, as a matter of law, John could have secured a divorce in the following States: *Arkansas,* Ark.Stat. § 34–1208 (Supp.1969) (six weeks); *Idaho,* Idaho Code § 32–701 (Supp.1969) (six weeks); *Nevada,* Nev.Rev.Stat. § 125.020 (Supp.1969) (six weeks); *Utah,* Utah Code Ann. tit. 30, ch. 3 § 1 (1953) (three months); *Wyoming,* Wyo.Stat. §§ 20–39, 48 (1957) (sixty days).

Contrary to the contention of Barbara's counsel, John also could have secured a divorce in his home State of Texas. The relevant Texas statute then effective prescribed a residency requirement of one year in the State and six months in the particular county where the *ex parte* divorce was sought. Tex.Code Ann. tit. 75, art. 4631 (1957). John having been raised in Texas, and having lived the majority of his life in Texas, did not necessarily lose his Texas residency by virtue of his service in Vietnam or his brief stay in Maryland. So long as John maintained a good-faith intention to make Texas his home, he remained a Texas resident, and thus was able to avail himself of the laws of Texas.

In the remaining States and the District of Columbia John could not have secured an *ex parte* divorce due to the residency requirements then in effect.

10. A decree of divorce granted in a foreign country by a court having jurisdiction generally will be recognized in this country. *See* Annot., 12 A.L.R.3d 1319 (1967). Recognition of such a divorce is not compelled by the full faith and credit clause of the federal Constitution; rather, a rule of comity exists by which federal and State courts give due regard to the judgments of courts of another nation. *See generally,* Clark, *Estoppel Against Jurisdictional Attack on Decrees of Divorce,* 70 Yale L.J. 45 (1960); Comment, *Mexican Divorce—A Survey,* 33 Fordham L.Rev. 449 (1965).

By no means do all foreign divorces receive recognition by the courts of this country. Indeed, a divorce obtained in a foreign country will normally not be recognized as valid if neither spouse was a good-faith domiciliary in that country. *E. g., Weber v. Weber,* 200 Neb. 659, 265 N.W.2d 436 (1978). Barbara cannot deny, however, that John could have established domicile, and obtained a valid divorce in Mexico, Haiti, the Dominican Republic, or another foreign nation.

11. Barbara did testify that after John's death she filed for Social Security Benefits as John's widow. It is uncontroverted, as well, that as a result of an investigation conducted by the Social Security Administration, Barbara was named John Hewitt's widow and receives monthly benefits for his death. Appended to post-trial briefs submitted on Barbara's behalf are photostats of documents from the Social Security Administration indicating that searches conducted in various localities—including parts of Texas, North Carolina, Maryland, and New Jersey—failed to uncover any record of a divorce between John and Barbara Hewitt.

For several reasons, the Court must discount arguments based on the documents of the Social Security Administration. First and foremost, the documents were not introduced and have not been admitted in evidence. Although the Court expresses no opinion about the admissibility of the Social Security records, it is plain to the Court that it would be unfair to consider the records now. Counsel for Nancy Hewitt has had no opportunity to challenge the documents. Moreover, even assuming the documents had been properly offered and admitted, the Court would regard them—with nothing more—as unpersuasive. None of the information contained in the records has been verified or authenticated. What is more, the records themselves do not indicate that those who conducted the search were qualified to conduct a competent search.

vanced by Barbara fundamentally misperceive the nature and strength of the presumption favoring the second marriage—as that presumption has been established by Virginia decisional law—as well as the nature and sufficiency of the evidence necessary to rebut that presumption, the Court will answer the arguments in some detail.[12]

Virginia adopted the generally accepted rule that presumes the validity of the second marriage by the decision rendered for a unanimous court in *Parker v. American Lumber Corp.*, 190 Va. 181, 56 S.E.2d 214 (1949). The language used in *Parker* to define the presumption was quoted with approval by the Virginia Supreme Court twenty years later in *De Ryder v. Metropolitan Life Insurance Co.*, 206 Va. 602, 145 S.E.2d 177 (1965). In both opinions the Court quoted the same language to describe the strength and nature of the presumption:

> "The presumption arising in favor of the validity of a second marriage is not a conclusive presumption, but . . . a rebuttable presumption, and the one contending against the legality of the second marriage is not required to make plenary proof of a negative averment. It is enough that he introduce such evidence as, in the absence of all counter testimony, will afford reasonable grounds for

presuming that the allegation is true, and when it is done the onus probandi will be thrown on his adversary. . . ."

> "[W]here the presumption of law is a true rule of law assigning a prima facie force to an inference of fact, . . . the basic inference of fact at all times remains to exert its full logical effect in the case. . . ."

*De Ryder*, 206 Va. at 608, 145 S.E.2d at 181; *Parker*, 190 Va. at 186, 56 S.E.2d at 216 (quoting *Brokeshoulder v. Brokeshoulder*, 84 Okl. 249, 204 P. 284, 291 (1921).

Read as a whole, and in the context of the *De Ryder* and *Parker* cases, this language suggests that in Virginia the presumption in favor of the validity of the second or later marriage is more than, as counsel for Barbara Hewitt contend, "simply a rule of evidence." The strength of the presumption, which was emphasized by the Court in *De Ryder*,[13] necessitates that the evidence in rebuttal be itself strong. The presumption, furthermore, is not one which disappears, or "goes out the window" (to quote my law school Professor Nash), when met with rebuttal evidence. Rather, it is a presumption that continues to have weight, due to the strength of the policies that give it purpose,[14] in the face of contrary evidence.

**12.** To support these positions counsel rely chiefly on *Woolery v. Metropolitan Life Insurance Co.*, 406 F.Supp. 641 (E.D.Va.1976). In *Woolery*, Judge Lewis ruled that evidence of a prior marriage was sufficient to rebut the presumption of the validity of a later marriage and to shift the burden to the second wife of showing that the prior marriage had been terminated. 406 F.Supp. at 645. In so ruling Judge Lewis rejected the contention of the last wife that the prior wife, in order to overcome the presumption favoring the later marriage, had an obligation to proffer some documentary evidence showing that no divorce or annulment had been granted dissolving the prior marriage. *Id.*

This Court is reluctant to reject the rationale of a coordinate court of the same jurisdiction. Nonetheless, for the reasons advanced in the text of this opinion, this Court believes that the *Woolery* decision is at variance with established Virginia law.

**13.** The Court in *De Ryder* specifically referred to the presumption as a "strong presumption." 206 Va. at 608, 145 S.E.2d at 181. Courts in

other jurisdictions have used similar language to characterize the nature of the presumption. *Cf., Mullinax v. Mullinax*, 447 S.W.2d 428 (Tex. Civ.App.1969) ("The presumption . . . 'is one of the strongest, if, indeed, not the strongest, known to law . . . .' ") *In re Estate of Hadley*, 57 Misc.2d 652, 293 N.Y.S.2d 224, 226 (1969). (The presumption is particularly strong in actions "involving heirship and legitimacy of children.") *In re Grauel's Estate*, 70 Wash.2d 870, 425 P.2d 644, 645 (1967). (The presumption is strong "and grows stronger with passing of years . . . .").

**14.** The presumptions supporting the validity of the second marriage arise "because the law presumes morality and legitimacy, not immorality and bastardy." *Parker v. Amercian Lumber Corp.*, 190 Va. 181, 195, 56 S.E.2d 214, 216 (1949). Another reason given for presuming the validity of the second marriage is that it is more equitable to require the party attacking the second marriage to prove its invalidity than to put the innocent party thereto to proof of the capacity of the other contracting party. *See*

The nature and the amount of evidence that will provide reasonable grounds for finding that the first marriage has not been dissolved will vary in each case. As a rule, however, the contesting party must attempt to document in every reasonable manner the absence of a divorce. In *Parker*, the first wife established a valid marriage, and testified that she had not divorced the deceased nor received notice of a divorce obtained by him. The Virginia Supreme Court was unpersuaded, observing that "[t]here was no other attempt to prove there had been no divorce." 190 Va. 187, 56 S.E.2d at 216. Similarly, in *De Ryder* the first wife by competent evidence proved that her former husband had not secured a divorce in several places where he lived— Orange County, New York, and Norfolk, Hampton, and Elizabeth City counties, Virginia. Nonetheless, the Court ruled that the first wife failed to rebut the presumption favoring the last marriage because the evidence did not show that divorce records were searched in other places where the deceased had resided, or could have resided. 206 Va. at 606–07, 145 S.E.2d at 182.[15]

█ The Court does not suggest that it is incumbent upon the party seeking to overcome the presumption of the validity of the second marriage to document the absence of a divorce dissolving the first marriage in *every* jurisdiction where a divorce could possibly have been obtained. Were such a rule recognized in this day of divorce-on-demand the presumption favoring the second marriage would not be rebuttable, but effectively irrebuttable. The Virginia litigant seeking to negate the existence of a divorce generally does have a burden, however, of showing that no divorce was entered in jurisdictions where the parties resided or where on any reasonable basis a decree might have been obtained.[16]

In the case at bar, Barbara Hewitt, John Hewitt's first wife, has failed to introduce evidence that affords reasonable grounds for presuming that her marriage to John was not dissolved. Barbara's claim that John recognized his marriage to her subsequent to his marriage to Nancy is insufficiently substantiated. Barbara's contention that John could not have obtained a divorce during the three month period between the time he left Barbara and married Nancy is erroneous. Barbara has introduced no documentary evidence that indicates the absence of a divorce between John and Barbara.[17] Not being successfully rebutted, the presumption of the validity of John Hewitt's second marriage must prevail. The Court finds, accordingly, that Nancy Anne Hewitt is John Hewitt's surviving spouse, and is thus a beneficiary pursuant to Virginia's Death by Wrongful Act statute, Va.Code § 8.01–53 (Supp.1979).

### III

The Court having found that Nancy Hewitt is John Hewitt's surviving spouse, two interrelated tasks remain. The Court must determine whether the amount of the settlement tendered to the Court is sufficient to compensate the statutory wrongful death beneficiaries. Va.Code § 8.01–53

*Lampkin v. Travelers' Ins. Co.*, 11 Colo.App. 249, 52 P. 1040 (1898).

**15.** It is significant, as well, that in *Brokeshoulder v. Brokeshoulder*, 84 Okl. 249, 204 P. 284 (1921), the Oklahoma decision from which the Virginia rule derives, the Supreme Court of Oklahoma concluded that the presumption of the validity of the second marriage had been overcome only after the first wife established that no divorce was entered in each of the localities where the deceased husband "had ever established [a] . . . permanent residence." *Id.*, at 254, 204 P. at 288. *See also Note, Evidence: Rebutting Oklahoma's Presumption of Validity of a Subsequent Marriage,* 30 Okla.L.Rev. 433 (1977).

The Court is cognizant that the *Brokeshoulder* opinion was written well before the Supreme Court's decision in *Williams v. North Carolina,* 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1942). The acceptance of *ex parte* divorce, and the near universal liberalization of divorce laws, undoubtedly has had the practical effect of adding to the burden of the person challenging the validity of the later marriage.

**16.** A similar rule has been fashioned in other jurisdictions. *See Quinn v. Miles,* 124, So.2d 883 (Fla.App.1960); *Dockery v. Brown,* 209 S.W.2d 801 (Tex.Civ.App.1947).

**17.** *E.g.* Certification of a record search by a lawyer or a clerk of court with negative results.

(Supp.1979). Second, assuming the funds in settlement are sufficient, the Court must determine how those funds should be apportioned among Nancy Hewitt and the other statutory beneficiaries. Va.Code § 8.01–52 (Repl. vol. 1977).[18]

Although specifying the beneficiaries of an action for wrongful death, the Virginia statute places no dollar limit on the amount of compensation that may be awarded. Va. Code § 8.01–52 (Repl. vol. 1977). Only the statutory admonition that damages be "fair and just," a phrase entitled to "a broad and liberal construction," suggests the boundaries of a damage award. *Eisenhower v. Jeter*, 205 Va. 159, 164, 135 S.E.2d 786, 789 (1967). The Virginia courts repeatedly have emphasized the discretion enjoyed by a court or a jury in ascertaining the amount of recovery that is appropriate. *E. g., Matthews v. Hicks*, 197 Va. 112, 87 S.E.2d 629 (1955); *Transit Corp. v. Edenton*, 170 Va. 361, 196 S.E. 648 (1938).

■ The Court here is asked to approve a settlement totaling $400,000.00. Counsel for the estate of John Hewitt assures the Court that the amount is satisfactory. More surprising, counsel for the children of John Hewitt by Barbara Hewitt, these children being the later discovered beneficiaries, have made no objection to the size of the settlement. This Court admits to some misgivings about approving a settlement amount that was arrived at before the number and nature of the beneficiaries were known. The Court hesitates, however, to tamper with a settlement that parties, who are represented by counsel, agree is sufficient. The Court has considered the matter independently of the views of counsel, moreover, and has arrived at a conclusion that the sum of $400,000 is supportable as fair and just compensation.

■ The Virginia statute providing for recovery for Death by Wrongful Act is not penal or exemplary but remedial. *Wilson v. Whittaker*, 207 Va. 1032, 1038, 154 S.E.2d 124, 128 (1967). Being remedial, the statute is construed broadly. *Nelson v. Chesapeake & O. R. Co.*, 88 Va. 971, 14 S.E. 838 (1892). Both the language of the statute, and the cases interpreting the statute, emphasize that its purpose is to provide compensation—in the broadest sense—to the family of the deceased:

> The verdict or judgment of the court trying the case without a jury shall include, but may not be limited to, damages for the following:
>
> 1. Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent;
>
> 2. Compensation for reasonably expected loss of (i) income of the decedent and (ii) services, protection, care and assistance provided by the decedent . . . . .

Va.Code § 8.01–52 (Repl.1977).[19] Damages,

---

**18.** Va.Code § 8.01–55 (Repl.1977) provides that:

> [T]he personal representative of the deceased may compromise any claim to damages [for death by wrongful act] . . . after action [is] brought, with the approval of the court wherein any such action [is] brought . . . Such approval may be applied for by the personal representative, on petition to such a court, stating the compromise, the terms thereof, and reasons therefor, and convening the parties in interest . . . . .

*Id.*

Although the statutory language pertaining to court approval of a compromise appears to be permissive, it is settled that a compromise without court approval is not binding. Thus, the statutory language pertaining to court approval is mandatory. *See Caputo v. Holt*, 217 Va. 302, 228 S.E.2d 134 (1976).

**19.** The statute further provides that wrongful death damages shall include compensation for expenses incurred for the care, treatment, and hospitalization of the decedent incident to the injury resulting in death, and for reasonable funeral expenses. Va.Code § 8.01–52(3), (4) (Repl.1977). Because John Hewitt died when the accident occurred, no hospitalization or related expenses were realized. Funeral costs were borne by Nancy Hewitt and her family; that portion of the settlement funds this day directed to be distributed to Nancy Hewitt, John Hewitt's surviving spouse, includes reimbursement for funeral expenses.

For a general treatment of damages recoverable for wrongful death in Virginia, under a former but related version of Virginia's statute, *see* Craig, *Damages Recoverable for Wrongful Death*, 5 U.Rich.L.Rev. 213 (1971); Hoffman, *Recovery in Wrongful Death Actions in Virginia*, 8 Wash & Lee L.Rev. 169 (1951); Note, *Wrongful Death Damages in Virginia*, 12 Wm. & MaryL.Rev. 396 (1970).

after costs and reasonable attorney's fees are allocated, should be awarded individually and separately to the statutory beneficiaries according to their respective losses. Va.Code § 8.01–54(A), (C) (Repl.1977). *Carroll v. Snead*, 211 Va. 640, 644, 179 S.E.2d 620, 623 (1971).

■ The evidence before the Court proves that Barbara Hewitt's children, after September 1969, received neither financial nor emotional support from John Hewitt. The evidence shows, indeed, that the children saw their father, if at all, only once—and then for only a few minutes—in the eight years that elapsed from the time he left Barbara to the time he was killed. During the entirety of that eight-year period Barbara failed to seek the support to which she and her children were entitled. The light of these facts, the Court concludes that the children could have had no reasonable expectation of paternal support from John Hewitt. At most the children lost a bare expectancy or possibility of support, an expectancy that the Court values—with some difficulty—at three percent of the distributable fund.[20]

No funds will be distributed to Barbara Hewitt's children for sorrow, mental anguish, solace and the like. The Court is unable to find that these children suffered grief upon the death of a man they could not remember having seen,[21] a perfect stranger who had provided them neither moral nor material support despite an obligation to do both. Any emotional loss the children may have comprehended was fleeting and shallow. The three children, jointly shall be awarded three percent of the distributable fund.

Each of Nancy Hewitt's children by John Hewitt will be awarded eleven percent of the distributable fund as compensation for the death of their father. The evidence establishes that John Hewitt provided well for his family by Nancy, and was an attentive and devoted father to those children.

Ronald Wayne Hewitt, age seven, has medical needs due to speech and emotional problems; William David Hewitt, age six, is in good health. The Court believes that the sum awarded will cover the children's needs though their majority and enable them to pursue higher education without regard to cost. The children undoubtedly have grieved the death of their father. The Court is confident, however, that these children, like most children, have been blessed with an ability to live with and overcome sorrow.

The remaining seventy-five percent of the distributable fund will be awarded to John Hewitt's surviving spouse, Nancy Anne Hewitt. Nancy is thirty-four years of age. She is employed part-time as a substitute school teacher, earning thirty dollars per day for her work in that capacity. She receives social security benefits for her children. The sum awarded represents compensation not only for the lost income, services, protection, companionship, and care of the decedent, but also for the sorrow that a devoted wife must feel and endure on the death of her husband. For this loss, the law provides only money as compensation.

## IV

■ Counsel for the administrators of the estate of John Carthel Hewitt request fees, for services rendered, of $133,333.33, or one-third of the agreed settlement. Counsel also seek an additional $12,457.07 as reimbursement for expenses incurred in representing the estate. None of the various parties to this litigation have objected to these figures. The Court, moreover, has examined the affidavits and briefs submitted by counsel for the administrators and has concluded that the requested fees and itemized costs are reasonable. Accordingly, the Court will direct that the sums sought by counsel for the administrators be awarded.

---

20. By distributable fund, the Court means the settlement fund with accrued interest after deductions for the payment of attorneys' fees and costs. *See* Va.Code § 8.01–54(C) (Repl.1977). The Court regards compensation for guardians *ad litem* as a part of costs.

21. Indeed, Barbara had to "hunt up" an old photograph of John to show her children what he looked like.

## V

The Court was informed at the hearing of a problem with respect to Virginia Workmen's Compensation payments paid and due to be paid to the Nancy Hewitt family. By exchange of correspondence, counsel, it was represented to the Court, had in the main resolved the mechanics of handling the problem upon learning the Court's determination of the principle issues raised in the wrongful death settlement. In summarizing the application of the wrongful death settlement to the workmen's compensation problem, counsel agreed that the disposition of the latter problem would "follow in the wake" of the decisions and proportions established in the wrongful death settlement as finally approved by the Court.

The Court having now set forth its findings and conclusions on the wrongful death settlement DIRECTS that counsel for the affected parties file with the Court within ten days of the entry hereof a plan for the disposition of the workmen's compensation funds.

An appropriate order shall issue.