COURT OF APPEALS OF VIRGINIA


Present: Judges Frank, Kelsey and Haley
Argued at Chesapeake, Virginia


MANSUR RAHNEMA

                                                              OPINION BY
v.        Record No. 0162-05-1                       JUDGE D. ARTHUR KELSEY
                                                          FEBRUARY 14, 2006

SHAHLA RAHNEMA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Frederick B. Lowe, Judge

James Ray Cottrell (Martin A. Gannon; David H. Fletcher;
Chistopher W. Schinstock; Kyle F. Bartol; John K. Cottrell;
Gannon & Cottrell, P.C., on briefs), for appellant.

Glenn R. Croshaw (Peter V. Chiusano; Kimberly L. Stegall;
Willcox & Savage, P.C., on brief), for appellee.


In Rahnema v. Rahnema, 2000 Va. App. LEXIS 163 (March 7, 2000) (Rahnema I), we

affirmed the trial court's enforcement of a marital agreement between Dr. Mansur Rahnema and

Shahla Rahnema. Four years later, Dr. Rahnema filed an annulment action seeking to declare his

prior marriage to Ms. Rahnema void as bigamous and the agreement unenforceable as a

consequence. The trial court, sitting as factfinder, found Dr. Rahnema's evidence of bigamy

unpersuasive and entered final judgment dismissing the annulment action with prejudice.

Finding no error in the trial court's judgment, we affirm.

I.

A.   BACKGROUND & PRIOR PROCEEDINGS

The parties married in 1993. Three months later, they entered into an agreement

specifying Ms. Rahnema's property and support rights in the event of a divorce and granting her

a contractual right to 80% of Dr. Rahnema's assets upon his death. The marriage ended in

divorce in 1999. After we approved this agreement in <u>Rahnema I</u>,[1] the case continued on the circuit court's docket for several years. The court scheduled the final equitable distribution hearing in April 2004. The day before the hearing, Dr. Rahnema filed this annulment action seeking to declare his marriage void due to Ms. Rahnema's alleged bigamy.[2] Dr. Rahnema also became the complaining witness in a criminal action against Ms. Rahnema charging bigamy. The criminal jury trial ended with an acquittal in August 2004.

B. PRETRIAL DISCOVERY DISPUTES

In support of his annulment action, Dr. Rahnema scheduled two overseas depositions in October 2004. The first was taken in London of Hedayatollah Mortazavi, an Iranian national. Mortazavi claimed to witness Ms. Rahnema's prior divorce from another man and to recognize a handwritten copy of the Iranian divorce decree showing the divorce took place after her marriage to Dr. Rahnema.

Dr. Rahnema also attempted to take a deposition of Ms. Rahnema's alleged former spouse, Mohammad Hossein Alizadeh, in Istanbul, Turkey. The deposition was originally scheduled for London, changed with notice to Ankara, and then changed without notice to Istanbul. The deposition actually took place a day after the date specified in the amended deposition notice. Ms. Rahnema's counsel did not attend this deposition. The witness testified in an unidentified foreign language and dialect (presumably some variation of Farsi) while an

---

[1] Though immaterial to the present appeal, we also disapproved a "second set of agreements" granting Ms. Rahnema additional property rights. <u>Rahnema I</u>, 2000 Va. App. LEXIS 163 at *9-11.

[2] "[A] bigamous marriage is void and it confers no legal rights to the parties. It is 'contrary to the laws of Virginia and public policy.' Only 'upon decreeing the dissolution of a marriage' do the courts of Virginia have jurisdiction to award spousal support or equitable distribution." <u>Shoustari v. Zamani</u>, 39 Va. App. 517, 520, 574 S.E.2d 314, 315 (2002) (quoting <u>Kleinfield v. Veruki</u>, 7 Va. App. 183, 190, 372 S.E.2d 407, 411 (1988)).

interpreter translated the witness's responses into English. The interpreter, however, presented no credentials verifying his competence to translate the witness's language and dialect into English.

Dr. Rahnema's counsel began and finished her questioning of the witness before the court reporter arrived. The court reporter, Tamar Koçyan, showed up just as the interview had ended. Koçyan obtained two audiotapes of the interview and later produced a document entitled "Official Transcription." Identifying herself as a Turkish "Sworn Translator" and "Notary Public," Koçyan's transcription stated that she "transcribed the English parts" of the audiotapes "to the extent" she could understand them. "Any parts left blank, marked as xxx or written wrong," Koçyan noted, were "due to [her] inability to understand the exact words."

The circuit court entered a scheduling order setting the trial date as October 18, 2004. The order required each party to produce exhibit and witness lists ten days before trial and to file objections to those lists no later than five days before trial. Untimely objections, the order stated, would be "deemed waived absent leave of court for good cause shown." Shortly after the entry of the scheduling order, the trial date was continued to December 13, 2004. Neither the parties nor the trial court, however, amended the scheduling order to reflect this change.

In another pretrial order, entered in the parallel equitable distribution case, the circuit court directed that all "exhibits admitted at the trial" of the criminal case against Ms. Rahnema "be transferred" to the annulment case. Prior to the December 13 trial in the annulment action, Dr. Rahnema filed an exhibit list that included, among other things, all of the "Commonwealth's exhibits" from the criminal trial as well as the "transcript of the criminal trial." Dr. Rahnema also listed as exhibits the *de bene esse* deposition taken in London and Koçyan's "Official Transcription" she made from the audiotapes recorded in Istanbul.

Four days before trial, Ms. Rahnema filed a motion *in limine* to preclude the use of the "Official Transcription" of the Istanbul witness as a *de bene esse* deposition.  The trial judge asked the parties to address the motion *in limine* at the start of the trial.  Ms. Rahnema argued that the "Official Transcription" violated multiple procedural requirements governing the taking and use of foreign *de bene esse* depositions.  See Rules 4:3, 4:5, 4:7 & 4:7A.[3]  In response, Dr. Rahnema argued that Ms. Rahnema's objections should be deemed untimely pursuant to the pretrial scheduling order.

The trial judge did not rule on the specific procedural objections raised by Ms. Rahnema.  Instead, he found the transcription too unreliable to have any evidentiary weight in any event.  Koçyan's "Official Transcription," the trial judge stated, could not "be relied upon by the Court with any degree of certainty in making a determination that this Court has to make with regard to the very important issue which is before the Court . . . ."  The judge came to this conclusion because the document "was really not a deposition at all, but was an audiotape which was later supposedly, I guess, translated and transcribed subsequent to the actual occurrence of it."  Particularly troublesome for the trial judge was

> the fact that it was taken by audiotape beforehand, [and] we don't have the audiotapes.  There is no way for us to know whether or not the transcription was accurate from the audiotapes.  It's too unreliable, and the Court is not going to consider it.

The "method of taking the deposition," the trial judge concluded, rendered the final product inherently untrustworthy.

---

[3] Ms. Rahnema also sought the exclusion of the London deposition transcript.  The trial court denied the motion *in limine* with respect to this deposition.  That issue has not been raised on appeal.

Dr. Rahnema then sought to introduce into evidence the testimony given by his brother, an 84-year-old Iranian national, during the criminal trial. Ms. Rahnema objected, arguing that this evidence did not satisfy the requirements of the former testimony exception to the hearsay rule. In response, Dr. Rahnema took the witness stand and testified that his brother intended to stay in the United States for the annulment trial which was initially scheduled for October 2004. When the trial was continued to December 2004, his brother decided to return to Iran. Dr. Rahnema admitted he did not ask his brother to testify at the rescheduled trial because of concerns about his health. Dr. Rahnema added that he was familiar with correspondence between counsel addressing the possibility of a *de bene esse* deposition being taken of his brother. No such deposition, however, ever took place. Finding the evidence of unavailability unpersuasive, the trial judge sustained Ms. Rahnema's objection to the use of the transcript from the criminal trial.

The next dispute at trial involved Dr. Rahnema's request that the prosecution exhibits from the criminal trial be admitted in the annulment proceeding. Dr. Rahnema argued that a prior order in the related divorce case "transferred *every exhibit* from the criminal trial to this case." The trial judge agreed, noting that the criminal trial exhibits were "all here" allowing him "to consider *all of those exhibits*." "All right, sir," Dr. Rahnema's counsel replied. Neither party objected to the trial judge's decision to consider these exhibits.

The trial judge then confirmed his understanding: "So now I have before me the exhibits previously filed in this suit, *additional exhibits filed in the criminal trial of Ms. Rahnema*, and an original deposition as previously set forth on the record which was taken in London. Now, with that having been said, what's next?" It was at this point during the trial, Dr. Rahnema concedes, that both the prosecution and defense exhibits from the criminal case "were received into evidence" by the trial judge. See Appellant's Brief at 8 (citing J.A. 497).

Dr. Rahnema then ended his case-in-chief with his only live witness, Armad Askarinan, an Iranian cab company owner living in Sweden. Testifying through an interpreter, Askarinan claimed to be familiar with "marriage and divorce registry books in Iran" because prior employment in Iran gave him access to such records. He testified that, under Iranian law, a wife could not travel abroad without her husband's permission. The Iranian passport, he added, would reflect whether such permission had been given. By agreement, the parties then read into evidence a portion of Askarinan's testimony at Ms. Rahnema's criminal trial. In it, Askarinan described his visit to the Iranian registry office and his videotaping of Ms. Rahnema's alleged prior marriage certificate. The videotape was replayed for the trial judge.

Dr. Rahnema also presented to the trial judge a copy of a discovery order entered in the equitable distribution proceeding. The order directed Ms. Rahnema to produce copies of any passport in her possession. Dr. Rahnema had an incomplete copy of her Iranian passport, as it lacked the information showing her marital status. The failure to produce the entire passport, Dr. Rahnema argued, permitted an adverse inference that the complete passport would show her alleged prior marriage. In response, Ms. Rahnema pointed out that the order had not been entered in the annulment case and, in any event, she did not have her Iranian passport because Dr. Rahnema had taken it years earlier. The trial judge took the matter under advisement.

Following the close of Dr. Rahnema's case-in-chief, Ms. Rahnema moved to strike the evidence on the ground that he had not proven bigamy by clear and convincing evidence and thus could not be awarded an annulment.[4] She noted that "the documents that this Court has before it are a part of the criminal proceeding." Included in those exhibits were statements from Iranian officials declaring the alleged marriage certificate to be a forgery. Ms. Rahnema also

---

[4] Ms. Rahnema also argued that *res judicata*, collateral and judicial estoppel principles, and the sealed-contract doctrine all barred Dr. Rahnema's bigamy claim. Given its holding, the trial court did not decide these issues. Given our holding, neither do we.

contended that the prosecution exhibits from the criminal case should be disregarded due to the lack of any credible authentication or foundation.

Dr. Rahnema's counsel objected to the motion, arguing that "the law in Virginia is quite clear there is no such thing as a motion to strike in a chancery case. The chancellors are required to hear all the evidence and then to make a decision." In any event, Dr. Rahnema argued, the prosecution exhibits at the criminal trial, coupled with the videotape of the documents found in the Iranian registry office, demonstrated the existence of Ms. Rahnema's prior marriage. Ms. Rahnema's failure to produce her complete Iranian passport, Dr. Rahnema added, itself created an adverse inference against her on this issue.

In response, the trial judge again confirmed that the criminal exhibits had been made part of the evidentiary record by agreement. "Let me make sure we understand each other," the judge stated. "I think we all agreed what was submitted to the Court in the criminal case was to be made a part of the record?" Dr. Rahnema's counsel answered, without qualification, "Yes, sir, that's correct." Ms. Rahnema's counsel agreed: "That's correct. All of that is in . . . ."

After advising counsel he would take the motion to strike under advisement, the trial judge asked Ms. Rahnema's counsel if he intended to "put on any evidence." Ms. Rahnema's counsel replied that he wanted to inventory the contents of the exhibits from the criminal trial. If they all "matched up with what I have here," he advised the court, "that would be it, Judge." The trial judge then encouraged the parties to double-check the exhibits so that "nobody starts crying foul at the eleventh hour."

After a recess, Dr. Rahnema's counsel stated for the first time that he objected on authentication grounds to the *defense* exhibits from the criminal case. "Even though everybody agreed that what was in the criminal trial would be put into evidence at this trial," the trial judge asked, "you still object to them because they are not authenticated?" Dr. Rahnema's counsel

said yes. Ms. Rahnema's counsel then stated, if so, he too would "object to everything that went in the criminal trial for the same reasons." In response, the trial judge adjourned court with the comment that he had "tried to be patient with this for as long as" he could, but that he intended to consider all the evidence admitted in the case and to render his decision the following day.

The next morning, the trial judge announced he had reached a decision "as the trier of fact." Based upon all of "the facts as presented in this case," the judge held Dr. Rahnema failed to prove by clear and convincing evidence that Ms. Rahnema "was, in fact, married at the time that she entered into the marriage ceremony" with Dr. Rahnema.

## II.

On appeal, Dr. Rahnema argues that the trial judge (a) excluded evidence that should have been admitted and admitted evidence that should have been excluded, (b) erroneously considered the merits of the case when deciding the motion to strike, and (c) applied an incorrect burden of proof when assessing the evidence of bigamy.

### A. EVIDENTIARY CHALLENGES

Dr. Rahnema raises three issues concerning the trial court's evidentiary rulings. We find no reversible error in any of the three.

#### (i) *The Exhibits from Ms. Rahnema's Criminal Trial*

Dr. Rahnema claims the trial judge erred by admitting the defense exhibits from the criminal trial. We disagree. The trial judge made these exhibits "part of the record" in reliance on counsel's representations, which the judge expressly confirmed. A stipulation of counsel, particularly when relied upon by a court, cannot later be unilaterally withdrawn. Trial judges must be able to rely on counsel to make tactical concessions during trial, especially those "designed to narrow the issues and expedite the trial or settlement of litigation," McLaughlin v. Gholson, 210 Va. 498, 500, 171 S.E.2d 816, 817 (1970), without the risk of such reliance being

undermined later.  Once a stipulation is made, "there can be no objection to it."  Burke v. Gale,

193 Va. 130, 137, 67 S.E.2d 917, 920 (1951).  The trial court, therefore, did not err in refusing to

sustain Dr. Rahnema's belated objections to the defense exhibits from the criminal case.

(ii)  *Koçyan's "Official Transcription"*

Dr. Rahnema also challenges the trial judge's decision not to consider Koçyan's "Official

Transcription" of the Istanbul audiotapes, offered at trial as a *de bene esse* deposition.  Ms.

Rahnema waived her objections to the deposition, Dr. Rahnema contends, by failing to make a

timely objection as required by the pretrial scheduling order.

We find no fault with Dr. Rahnema's underlying premise.  To be effective, pretrial

deadlines in Rule 1:18 scheduling orders must be enforced by Virginia trial courts.  There is little

point in issuing such orders if they amount to nothing more than a juristic bluff — obeyed

faithfully by conscientious litigants, but ignored at will by those willing to run the risk of

unpredictable enforcement.  The impartial, consistent enforcement of scheduling orders provides

systemic benefits to litigants and trial courts alike.

We do not agree, however, that this premise has been offended in this case.  Even if Ms.

Rahnema waived all of her objections to the *admissibility* of Koçyan's "Official Transcription,"

that would not preclude her from arguing that the evidence should be given no probative weight

by the factfinder.  "A litigant's failure to raise an evidentiary objection cannot, *ipso facto*,

enhance the probative weight of evidence that is otherwise incompetent as proof of a particular

fact in controversy."  Exxon Corp. v. United States, 45 Fed. Cl. 581, 692 (Ct. Cl. 1999).

Consequently, if evidence admitted without objection "has no probative force or

insufficient probative value to sustain the proposition for which it is offered, the want of

objection adds nothing to its worth; and it will not support a finding."  1 John W. Strong,

McCormick on Evidence § 54, at 243 (5th ed. 1999) (footnote omitted).  An inattentive litigant,

for example, can waive a hearsay objection simply by forgetting to raise it. But he remains free to argue that the hearsay should nonetheless be disregarded *in toto* because, truth be told, it is still hearsay and thus entitled to little or no evidentiary weight. See, e.g., Marshall v. Kleinman, 438 A.2d 1199, 1201-02 (Conn. 1982) (observing that unobjected-to evidence remains "subject to any infirmities due to any inherent weaknesses").

In this case, the trial judge did not sit merely as the gatekeeper for admitting or excluding evidence. He also served as factfinder. And, in that capacity, the trial judge refused Koçyan's "Official Transcription" not because of any of Ms. Rahnema's procedural objections (whether waived or not) to its admissibility as a *de bene esse* deposition. Instead, the judge found the proffered exhibit inherently unreliable and consequently of no use to him in deciding the merits of the case.

The trial judge reached this conclusion primarily because the conspicuous absence of the interview audiotapes made it impossible to check, at any level, the accuracy of the after-the-fact transcription. To be sure, the need for doing so was apparent: Koçyan's transcription did not identify the language or dialect of the witness; disclose the translation credentials of the interpreter; establish that the interpreter was disinterested and unbiased; or provide any basis for discerning the competence of the putative court reporter (identified only as a Turkish "translator" and "notary public") who transcribed the interpreter's English "to the extent" she understood it.

For these reasons, even if the trial judge erred in failing to treat Ms. Rahnema's evidentiary objections as waived under the pretrial scheduling order, that error would be at most irrelevant and at best harmless. Any waiver caused by Ms. Rahnema's untimely objections to the transcription's admissibility did not preclude the trial judge, as factfinder, from finding the

transcription (whether admitted or not) inherently unreliable and thus wholly undeserving of evidentiary weight.[5]

    (iii) *Criminal Trial Testimony of Dr. Rahnema's Brother*

Dr. Rahnema's brother, an Iranian national, testified against Ms. Rahnema at her criminal trial in August 2004. He intended to stay and testify at the annulment trial, but decided to travel back to Iran after the trial was continued from October to December 2004. Before making the trip home, he stayed with his son who was living in New York. Dr. Rahnema did not take a deposition of his brother. Nor did Dr. Rahnema ask his brother to testify at the rescheduled trial. His brother was an elderly man with health problems, Dr. Rahnema explained.

In the annulment proceeding, Dr. Rahnema sought to introduce into evidence his brother's testimony at the criminal trial, claiming it fell within the former testimony exception to the hearsay rule. He argued that his infirm brother, at the time of the annulment trial, was unavailable because he was then outside the reach of Virginia process. The trial judge disagreed and excluded the testimony.

Under Virginia law, the "determination of the 'unavailability' of a witness is committed to the sound discretion of the trial court." Sapp v. Commonwealth, 263 Va. 415, 423-24, 559 S.E.2d 645, 649 (2002). "The party offering the testimony bears the burden of establishing the witness' unavailability." Bennett v. Commonwealth, 33 Va. App. 335, 347, 533 S.E.2d 22, 28 (2000) (*en banc*). "In cases involving absent witnesses, we have required 'that a sufficient

---

[5] Dr. Rahnema's argument presupposes that a *de bene esse* deposition can be listed as a trial "exhibit" in compliance with a Rule 1:18 scheduling order. As a general rule, however, a *de bene esse* deposition should be "treated as testimony" rather than an evidentiary exhibit. H. J. Heinz Co. v. Shafer, Inc., 188 Va. 320, 326-27, 49 S.E.2d 298, 300 (1948). Having not identified the Istanbul witness in his pretrial witness list, Dr. Rahnema faced a potential waiver of his own. The trial judge did not rule on this ground, however, and we likewise find it unnecessary to do so.

reason be shown why the original witness is not produced; and that it is impossible, fairly speaking, for the person offering the evidence to produce the living witness or to take his deposition.'" Sapp, 263 Va. at 424, 559 S.E.2d at 650 (quoting Wise Terminal Co. v. McCormick, 107 Va. 376, 379, 58 S.E. 584, 585 (1907)).[6]

By examining whether it was truly "impossible, fairly speaking" to bring the witness to trial and whether the proponent made a "diligent inquiry" into that possibility, Virginia law shows "a clear preference for live testimony and cross-examination rather than resorting to recitation of prior testimony." Sapp, 263 Va. at 424, 559 S.E.2d at 650; see also Doan v. Commonwealth, 15 Va. App. 87, 102, 422 S.E.2d 398, 406 (1992) (examining whether proponent exercised "reasonable diligence"). "We have held that reasonable or due diligence is that amount of prudence as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances." Bennett, 33 Va. App. at 347-48, 533 S.E.2d at 29 (citation and internal quotation marks omitted).

In this case, the trial judge did not abuse his discretion in rejecting Dr. Rahnema's assertion of his brother's unavailability. Dr. Rahnema's explanation, even if accepted at face value, did not necessarily demonstrate his due diligence. Dr. Rahnema's concern about his

---

[6] See generally Kent Sinclair et al., Virginia Evidentiary Foundations § 9.13, at 344-49 (1998). Some examples of situations satisfying the unavailability test include:

> (1) The declarant is dead. (2) The declarant is too ill to testify.
> (3) The declarant is insane. (4) The declarant is absent from the
> state and the party is unable to obtain the declarant's deposition.
> (5) The party has been unable by diligent inquiry to locate the
> declarant. (6) The declarant cannot be compelled to testify.
> (7) The opposite party has caused the declarant's absence.

Bennett, 33 Va. App. at 347, 533 S.E.2d at 28; Jones v. Commonwealth, 22 Va. App. 46, 51, 467 S.E.2d 841, 843 (1996); Doan v. Commonwealth, 15 Va. App. 87, 101, 422 S.E.2d 398, 406 (1992); see also Gray v. Graham, 231 Va. 1, 5, 341 S.E.2d 153, 155 (1986) (applying unavailability test to use of criminal transcript at later civil trial).

brother's infirm condition might explain why his brother would not be asked to fly back to the United States. But it does not explain why his brother could not have stayed for the rescheduled trial date or, if returning home was imperative for other reasons, why his brother could not have given a *de bene esse* deposition prior to leaving the country.

### B. RULING ON THE MERITS IN RESPONSE TO A MOTION TO STRIKE

Dr. Rahnema next argues that the trial court improperly addressed the underlying merits of the case in response to the motion to strike, rather than merely determining whether a *prima facie* case had been demonstrated.[7] On this issue, however, Dr. Rahnema specifically invited the trial judge to skip the motion to strike issue and rule directly on the merits.[8] Asserting that "the law in Virginia is quite clear there is no such thing as a motion to strike in a chancery case," Dr. Rahnema argued that the trial judge was "required to hear all the evidence and then to make a decision."[9] The trial judge did exactly that. After inquiring about any further evidence and

---

[7] "When a trial judge in a civil jury case, for example, entertains a motion to strike alleging that the plaintiff has not made out a *prima facie* case, the judge does not ask whether he personally believes that the evidence rises to a preponderance — rather, he asks whether the conclusion the plaintiff draws from the evidence would so 'defy logic and common sense' that no rational factfinder could adopt it." Cent. Va. Obstetrics & Gynecology Assocs., P.C. v. Whitfield, 42 Va. App. 264, 275, 590 S.E.2d 631, 637 (2004) (citing Upper Occoquan Sewage Auth. v. Blake Constr., 266 Va. 582, 590 n.6, 587 S.E.2d 721, 725 n.6 (2003)). Exactly the same standard applies to "a trial court's decision to strike the evidence in a bench trial," Claycomb v. Didawick, 256 Va. 332, 335, 505 S.E.2d 202, 204 (1998), even when the trial judge acts as a chancellor in equity, Polyzos v. Cotrupi, 264 Va. 116, 121, 563 S.E.2d 775, 777 (2002).

[8] A different law firm represented Dr. Rahnema at trial than the firm now representing him in this appeal.

[9] Dr. Rahnema's argument at trial would have been well taken prior to 1954, when motions to strike — as a means of testing the sufficiency of a *prima facie* case — did not exist in Virginia equity courts. See Code § 8.01-282 (authorizing, since its original enactment in 1954, motions to strike in chancery cases); see also William M. Lile, Lile's Equity Pleading & Practice § 247 n.6 (3d ed. 1952) (citing Kiss v. Gale, 187 Va. 667, 47 S.E.2d 353 (1948)); W. Hamilton Bryson, Bryson on Virginia Civil Procedure § VIII-F n.43 (3d ed. 2001).

being told nothing more would be offered, the trial judge considered all the evidence and rendered a decision on the merits.

Having taken this position with the trial judge, Dr. Rahnema cannot take an opposite position with us on appeal. "The principle is long standing in Virginia that an appellate court will not 'notice error which has been invited by the party seeking to take advantage thereof on appeal.'" McBride v. Commonwealth, 44 Va. App. 526, 529, 605 S.E.2d 773, 774 (2004) (citation omitted). No litigant can "be permitted to approbate and reprobate, ascribing error to an act by the trial court that comported with his representations." Boedeker v. Larson, 44 Va. App. 508, 525, 605 S.E.2d 764, 772 (2004) (quoting Asgari v. Asgari, 33 Va. App. 393, 403, 533 S.E.2d 643, 648 (2000)); see also Bomar v. Bomar, 45 Va. App. 229, 234, 609 S.E.2d 629, 632 (2005); Holden v. Holden, 35 Va. App. 315, 324, 544 S.E.2d 884, 888 (2001); Steinberg v. Steinberg, 21 Va. App. 42, 50, 461 S.E.2d 421, 424 (1995).

### C. BURDEN OF PROOF FOR BIGAMY ANNULMENT

A Virginia court's authority to annul marriages rests "within the inherent power of equity, inherited by it from the ecclesiastical courts of England." Pretlow v. Pretlow, 177 Va. 524, 548-49, 14 S.E.2d 381, 387 (1941). Applying the burden of proof generally applicable to rescission claims in equity — the clear-and-convincing standard — the trial judge addressed the merits of the bigamy claim and found Dr. Rahnema's evidence unpersuasive.[10] Dr. Rahnema argues that a lesser burden of proof, a mere preponderance of the evidence, should govern claims seeking an annulment based upon bigamy. We disagree.

---

[10] See, e.g., Drewry v. Drewry, 8 Va. App. 460, 463, 383 S.E.2d 12, 12 (1989) (applying clear-and-convincing standard to equitable claims seeking to rescind a marital property settlement agreement); see generally Coe v. Coe, 225 Va. 616, 622, 303 S.E.2d 923, 927 (1983) (applying clear-and-convincing standard to adultery claims); Jacobs v. Jacobs, 184 Va. 281, 296, 35 S.E.2d 119, 125 (1945) (requiring "clear evidence" to prove fraud warranting an annulment).

When a party asserts that a prior marriage renders a later one void as bigamous, "the second marriage is presumed to be valid." Parker v. Am. Lumber Corp., 190 Va. 181, 185, 56 S.E.2d 214, 216 (1949). It has been described as a "strong presumption," DeRyder v. Metropolitan Life Ins. Co., 206 Va. 602, 608, 145 S.E.2d 177, 181 (1965), "one of the strongest disputable presumptions known in law," Smith v. Smith, 131 P.2d 447, 447 (Ore. 1942).[11] While the presumption can be rebutted, Bennett v. Commonwealth, 236 Va. 448, 456, 374 S.E.2d 303, 309 (1988), the rebuttal proof must demonstrate not only a prior marriage, but also that the earlier marriage did not end before the later one began. Parker, 190 Va. at 185, 56 S.E.2d at 216; see also Hewitt v. Firestone Tire & Rubber Co., 490 F. Supp. 1358, 1362 (E.D. Va. 1980).

Given the strength of the presumption, "many courts place a special burden of persuasion upon the party attacking the validity of the second marriage by declaring that the presumption can only be overcome by clear, cogent, and convincing evidence." 2 John W. Strong, McCormick on Evidence § 344, at 449 (5th ed. 1999); see, e.g., Smith v. Heckler, 707 F.2d 1284, 1285-86 (11th Cir. 1983); Panzer v. Panzer, 528 P.2d 888, 892 (N.M. 1974). This principle parallels the general rule accepting "strong presumptions" unless "'clear and convincing' evidence has been introduced by the party opposing the presumption which establishes the nonexistence of the presumed fact." Kent Sinclair *et al.*, Virginia Evidentiary Foundations § 12.1[B][1], at 145-46 (Supp. 2004).

---

[11] See, e.g., Smith v. Heckler, 707 F.2d 1284, 1285-86 (11th Cir. 1983) ("one of the strongest presumptions in the law); Gordon v. R.R. Ret. Bd., 696 F.2d 131, 132 (D.C. Cir. 1983) ("one of the strongest in the law"); McKnight v. Schweiker, 516 F. Supp. 1102, 1108 (D. Md. 1981) ("among the strongest in the law"); Williamson v. Williamson, 101 A.2d 871, 872 (Del. Super. Ct. 1954) ("the strongest of the several presumptions applicable in annulment actions"); In re Williams Estate, 417 N.W.2d 556, 559 (Mich. Ct. App. 1987) ("a very strong presumption"); Troxel v. Jones, 322 S.W.2d 251, 257 (Tenn. Ct. App. 1958) ("one of the strongest presumptions known to the law"); In re Pilcher's Estate, 197 P.2d 143, 148 (Utah 1948) (recognizing the "strength given to this presumption, over and above that ordinarily given a presumption").

We agree that the clear-and-convincing standard, when applied to annulment claims alleging bigamy, provides the appropriate counterweight to the strong presumption favoring the challenged marriage. The trial court, therefore, did not err in applying this standard to Dr. Rahnema's annulment claim alleging bigamy.[12]

III.

Finding no reversible error in the trial court's evidentiary decisions, its response to the motion to strike, or its use of the clear-and-convincing standard, we affirm the final judgment in this case.

Affirmed.

---

[12] Dr. Rahnema does not argue that, under this standard of proof, no reasonable factfinder could have ruled against him on the merits. He does contend, however, that the trial judge failed to apply an "adverse inference" against Ms. Rahnema for not producing her complete Iranian passport. This assertion merits only a brief response. Virginia law recognizes a "spoliation or missing evidence inference," Wolfe v. Va. Birth-Related Neuro. Injury Comp. Program, 40 Va. App. 565, 580-81, 580 S.E.2d 467, 475 (2003), but treats it as a mere permissible inference rather than a true presumption, Jacobs v. Jacobs, 218 Va. 264, 269, 237 S.E.2d 124, 127 (1977). Even if the inference applied in this case, the trial judge had no legal compulsion to accept it. He had only the duty, as trier of fact, to consider it along with all other facts in evidence and reasonable inferences arising from them. Nothing in the record suggests the trial judge failed to understand this principle or to apply it properly.