COURT OF APPEALS OF VIRGINIA

Present: Judges Raphael, Lorish and Bernhard
Argued at Christiansburg, Virginia


KARL MOGENSEN

v.      Record No. 1644-24-3

COUNTY OF ROCKBRIDGE                                          OPINION BY
                                                       JUDGE LISA M. LORISH
DEBORAH MOGENSEN, S/K/A                                 JANUARY 27, 2026
  DEBBIE MOGENSEN

v.      Record No. 1645-24-3

COUNTY OF ROCKBRIDGE


FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY
Christopher B. Russell, Judge

Aaron L. Cook (Cook Attorneys, PC, on briefs), for appellants.

Meredith L. Baker, Deputy Solicitor General (Jason S. Miyares,[1]
Attorney General; Steven G. Popps, Deputy Attorney General;
Michelle Welch, Senior Assistant Attorney General; Kelci A. Block,
Assistant Attorney General, on brief), for appellee.


INTRODUCTION

Rockbridge County seized nearly 100 animals from the Natural Bridge Zoo Park, owned

and operated by appellants Karl and Deborah Mogensen. After trial, the jury returned verdicts

finding that 71 of the seized animals were treated cruelly. On appeal, we reject the Mogensens'

argument that—as federally licensed exhibitors—they are exempt from the operation of Code

§ 3.2-6569. Because the seizure of ill-treated animals is civil in nature, and the statute contains

no exclusionary remedy, we also conclude that the circuit court properly denied the motion to

_____

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

suppress. Nor do we find any error in the circuit court's excluding Gretchen Mogensen's testimony at trial. Finally, we find there is sufficient evidence to sustain the verdicts.

BACKGROUND

The Mogensens own and operate a zoological facility in Rockbridge County called Natural Bridge Zoo Park. During spring 2023, the Zoo housed over 300 birds and 300 mammals and a number of reptiles. In December 2023, the Virginia State Police executed a search warrant at the Zoo. Law enforcement seized or impounded a total of 99 animals.[2]

Following the seizure of the animals, the Attorney General filed two petitions on behalf of Rockbridge County to permanently seize the 99 animals under Code § 3.2-6569. The general district court initially heard evidence on the petitions and awarded 60 animals to the County and returned 40 to the Mogensens.[3] Both parties appealed the decision to the circuit court.

The Mogensens filed a motion to suppress in the circuit court and requested an evidentiary hearing. The circuit court heard argument on the motion and denied it because the proceedings were civil. The case then went to trial before a jury.

Over six days, the jury reviewed thousands of photos showing each animal and parts of the Zoo. They also heard testimony from an investigator with the Animal Law Unit of the Virginia Office of the Attorney General, a certified animal cruelty investigator who was a deputy with the Powhatan County Sheriff's Office, other officers from the state and local police, and veterinarians and other experts who assisted in the seizure.

---

[2] The Mogensens filed a motion directly against the Virginia State Police challenging that search and seeking the return of their animals, relying on Code § 19.2-60. On appeal from that motion, we issued a separate opinion rejecting their claims, concluding that there is no private right of action under Code § 19.2-60. *Mogensen v. Virginia State Police*, No. 1803-24-3 (Va. Ct. App. Jan. 27, 2026) (citing *Highlander v. Va. Dep't of Wildlife Res.*, 84 Va. App. 404, 438-49 (2025)).

[3] One animal gave birth while in the County's custody.

Around 2:00 a.m. before the final day of trial, counsel for the Mogensens notified the County that they planned to call Gretchen Mogensen, the daughter of Karl Mogensen and a facilities manager at the Zoo, as a witness. The County objected because her name was not listed on the court-ordered witness list, and the circuit court ruled that she could not testify.

The Mogensens moved to strike after the conclusion of the evidence, arguing that the many inconsistencies in the witness testimony rendered the evidence insufficient as a matter of law. The circuit court concluded that it was within the jury's province to assess the witnesses's credibility and denied the motion. The court then instructed the jury and presented them with 100 verdict forms, one for each animal. The jury found that 71 of the animals were cruelly treated and 29 were not. By final order entered on September 5, 2024, the court awarded 71 of the animals to the County and returned the rest to the Mogensens.

The Mogensens appeal.

ANALYSIS

The Mogensens raise four issues on appeal. First, they argue that they are exempt from forfeiture under Code § 3.2-6569 because they are regulated and inspected by the United States Department of Agriculture. Second, they argue that the circuit court erred by denying their motion for an evidentiary hearing to support their motion to suppress. Third, the Mogensens assign error to the circuit court's decision to exclude Gretchen's testimony at trial. Finally, they argue that the evidence was insufficient as a matter of law to sustain the jury's findings of cruelty or inadequate care for each of the 71 animals. We will address each of these arguments in turn.

A. The Mogensens are not exempt from Code § 3.2-6569.

The County seized the Mogensens' animals under Code § 3.2-6569, which allows "[a]ny humane investigator, law-enforcement officer or animal control officer" to "lawfully seize and impound any animal" in three different circumstances: first, if the animal "has been abandoned,"

second, if the animal "has been cruelly treated," and third, if the animal "is suffering from an apparent violation of this chapter that has rendered the animal in such a condition as to constitute a direct and immediate threat to its life, safety or health."  Code § 3.2-6569(A).

Subsection (F) of the seizure statute instructs that once an animal is seized, the court must determine whether the animal has been "(i) abandoned or cruelly treated, (ii) deprived of adequate care, as that term is defined in § 3.2-6500, or (iii) [involved in dogfighting]."  Code § 3.2-6569(F).  Code § 3.2-6500 defines adequate care as "the responsible practice of good animal husbandry, handling, production, management, confinement, feeding, watering, protection, shelter, transportation, treatment, and, when necessary, euthanasia, appropriate for the age, species, condition, size and type of the animal and the provision of veterinary care when needed to prevent suffering or impairment of health."

The Mogensens argue that, as exhibitors licensed by the United States Department of Agriculture, they are exempt from seizure under Code § 3.2-6569.  Because the seizure statute depends on inadequate care, the Mogensens turn to Code § 3.2-6503, which outlines the obligations of owners to adequately care for their companion animals.  They reason further that Code § 3.2-6503 criminalizes the failure of an exhibitor to provide adequate care to companion animals.  But, they argue, they do not qualify as an exhibitor because Code § 3.2-6500 defines "exhibitor" as "any person who has animals for or on public display, *excluding an exhibitor licensed by the U.S. Department of Agriculture*."  (Emphasis added).  Therefore, the Mogensens conclude that their zoo animals "are not subject to a § 3.2-6569(F) hearing to determine whether adequate care was provided" since they are licensed and regulated by the USDA as a Class C Exhibitor under the Animal Welfare Act.[4]

_____

[4] 7 U.S.C. §§ 2131 to 2160.

We disagree that the Mogensens are exempt from the operation of Code § 3.2-6569. "This Court reviews questions of statutory interpretation de novo." *Stafford Cnty. v. D.R. Horton, Inc.*, 299 Va. 567, 574 (2021). To start, nothing in this seizure statute limits its application to "exhibitors" as defined in Code § 3.2-6500. To the contrary, the statute protects "any animal" that has been ill-treated or abandoned and focuses on providing immediate and emergency care for those animals without regard for the owner's classification. It is true that an animal may be seized under Code § 3.2-6569 if an investigator has cause to believe the animal is "suffering from an apparent violation of this chapter that has rendered the animal in such a condition as to constitute a direct and immediate threat to its life, safety or health," and the adequate care statute is part of this Comprehensive Animal Care statute. But the seizure statute also allows for seizure of an animal that has been cruelly treated, without regard for whether that cruel treatment violates any other provision of the chapter.

Further, even if the Mogensens were correct—that seizure depended on an apparent violation of Code § 3.2-6503—that statute does not only apply to *exhibitors* of animals. It also applies to *owners* of animals. It requires that "[e]ach owner shall provide for each of his companion animals" adequate feed, water, shelter, space, exercise, care, treatment, and transportation. Code § 3.2-6503. "Owner" is defined under the Comprehensive Animal Care statute as any person who: has "a right of property in an animal"; "keeps or harbors an animal"; "has an animal in his care"; or "acts as a custodian of an animal." Code § 3.2-6500. The

Mogensens are clearly owners under this definition.[5]  Thus, it is irrelevant whether the

Mogensens do or do not qualify as exhibitors.  As owners, they could provide inadequate care

under Code § 3.2-6503.[6]

For these reasons, we disagree that the trial court erred by permitting the forfeiture to

proceed under Code § 3.2-6569 although the animals were in a facility regulated by the USDA.

The seizure provision in Code § 3.2-6569 protects an animal regardless of any other regulatory

scheme that might apply to the animal's keeper.  Said differently, a license from the USDA is not

a license to mistreat animals free from consequence in the Commonwealth.

B.  The Mogensens were not entitled to an evidentiary hearing on their motion to suppress.

The Mogensens generally argue that the seizure of the animals without sufficient

probable cause violated their rights under the Fourth Amendment of the United States

Constitution and analogous rights under the Virginia Constitution.  Accordingly, they claim that

the appropriate remedy for the violation is the exclusion of evidence at trial.  They assign error,

however, only to the circuit court's decision to deny their motion for an evidentiary hearing as

part of their motion to suppress.

Whether the exclusionary rule applies in a civil case like this one is a question of law that

we review de novo.  *Bd. of Supervisors of Fairfax Cnty. v. Leach-Lewis*, 303 Va. 225, 230

(2024).  "The Fourth Amendment applies of its own force to all government searches, regardless

---

[5] The Mogensens also referred to themselves as "owners of the animals subject to forfeiture" when they moved the circuit court to deny the seizure of all 100 animals.  At oral argument, counsel argued that the Mogensens do not own the animals but that the animals are owned by an LLC—Natural Bridge Zoo LLC.  But, to the extent the animals are owned by Natural Bridge Zoo LLC rather than the Mogensens, the Mogensens would lack standing to challenge the seizure.  "The point of standing is to ensure that the person who asserts a position has a substantial legal right to do so and that his rights will be affected by the disposition of the case." *Westlake Props. v. Westlake Pointe Prop. Owners Ass'n*, 273 Va. 107, 120 (2007).

[6] The Mogensens do not argue that federal law preempts Virginia from passing laws and regulations about the welfare of animals.

of whether it is incorporated by reference in a statute or ordinance." *Id.* at 231. With that said, "[u]nder settled law, the exclusionary rule, which applies in criminal cases, does not apply in civil cases." *Id.* But the United States Supreme Court "has applied the exclusionary rule to civil asset forfeitures" because "'a forfeiture proceeding is quasi-criminal in character.'" *Id.* (quoting *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 700 (1965)). That is to say that the object of a forfeiture proceeding, "like a criminal proceeding, is to penalize for the commission of an offense against the law." *One 1958 Plymouth Sedan*, 380 U.S. at 700; *see also Timbs v. Indiana*, 586 U.S. 146, 147 (2019) (explaining that civil in rem forfeitures fall within the protection of the Eighth Amendment's Excessive Fines Clause when they are "at least partially punitive").

Our Court has already held that animal forfeiture proceedings are civil and not criminal in nature. *Settle v. Commonwealth*, 55 Va. App. 212, 222-23 (2009). We explained that the animal forfeiture statute was "not so punitive in effect as to transform the civil remedy into a criminal penalty." *Id.* at 222. Rather, the statute "merely sets out the administrative process by which an animal warden or officer may seize an animal alleged to have been abused or neglected and provide for its care until the propriety of the seizure is resolved." *Id.* at 221. We then repeated our conclusion in *Settle* "that the underlying proceeding and appeal were civil in nature" in a later case. *O'Malley v. Commonwealth*, 66 Va. App. 296, 301-02 (2016); *see also Frouz v. Commonwealth*, 296 Va. 391 (2018) (finding that dangerous dog proceedings are civil in nature despite being governed by criminal procedure). Nor does the text of Code § 3.2-6569 "contain a rule calling for exclusion of evidence." *Leach-Lewis*, 303 Va. at 231 (finding that evidence seized pursuant to a zoning ordinance could not be suppressed under the applicable statute).

Ultimately, the animal forfeiture statute is not about punishing the owner of an animal. Rather, the statute is aimed at protecting the welfare of animals by removing them from settings

in which their safety is imperiled.  If we "appl[ied] the exclusionary rule to cases in which the welfare of an animal is threatened, we would prevent the state from being able to offer crucial evidence related to the neglect or abuse of animals that could be used to help remove the animal from such an environment."  *State ex rel. Dunn v. Connelly*, 325 A.3d 1159, 1188 (Conn. App. Ct. 2024).  For the purposes of the exclusionary rule then, Code § 3.2-6569 seizures cannot be treated like civil asset forfeitures.  And because the exclusionary rule is unavailable in an animal forfeiture proceeding, the circuit court did not err by denying the motion for an evidentiary hearing to support the Mogensens' motion to suppress.  As a matter of law, the remedy the Mogensens sought does not apply, and no amount of evidence could change that conclusion.  Thus, we do not consider whether the seizure was sufficiently supported by probable cause.

C.  The circuit court did not err by excluding Gretchen Mogensen's testimony at trial.

Next, the Mogensens argue that the circuit court erred by excluding the testimony of Gretchen Mogensen at trial.  The exclusion of witness testimony is reviewed "for an abuse of the court's discretion."  *Emerald Point, LLC v. Hawkins*, 294 Va. 544, 553 (2017).  So is "the manner in which [the trial court] oversaw the parties' discovery pursuant to the Rules of the Supreme Court of Virginia."  *Harvey v. Commonwealth*, 76 Va. App. 436, 472 (2023) (citation omitted).  "An abuse of discretion has occurred only when 'reasonable jurists could not differ' in their assessment that an erroneous result was reached."  *Id*. (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)).

The circuit court's criminal discovery order required both parties to disclose a witness list before trial.  The Mogensens submitted a list of 32 witnesses that did not include the name of Gretchen Mogensen, the daughter of Karl Mogensen and the manager of operations at the Zoo.  At the hearing before the general district court, Gretchen testified that she oversaw daily operations at the Zoo, including the daily care of the animals.  Nevertheless, the Mogensens

failed to include Gretchen on their witness list. At 2:10 a.m. on Monday morning, hours before the last day of trial was set to proceed, counsel for the Mogensens emailed the court and opposing counsel that they intended to call Gretchen during trial that day. Counsel explained that Gretchen was inadvertently omitted from the witness list and that they had "always intended to call her, but somehow [they] overlooked including her name on the list." The County objected to Gretchen testifying.

The trial court ruled, initially at trial and then again in response to a post-trial motion raising the same issue, that Gretchen would not be permitted to testify. The court did not dispute that the omission was unintentional but instead emphasized the lateness of the disclosure and that Gretchen was not mentioned during voir dire. Concluding that "the county had a right to go through this trial thinking that the [Mogensens] were just not going to call" Gretchen as a witness, the court found it would have caused "unfair, undue material prejudice" to the County to allow her to testify. In its written order denying the post-trial motion for reconsideration of this question, the court recalled that the County had "discussed at length that we did not have sufficient time to prepare for Ms. Mogensen's testimony."

"In order for [scheduling orders] to facilitate the orderly administration of cases, [they] must be enforced." *Reaves v. Tucker*, 67 Va. App. 719, 732 (2017). "There is little point in issuing such orders if they amount to nothing more than a juristic bluff, obeyed faithfully by conscientious litigants, but ignored at will by those willing to run the risk of unpredictable enforcement." *Rahnema v. Rahnema*, 47 Va. App. 645, 658 (2006). A trial court may impose a sanction for violating a court order regardless of whether another party has suffered prejudice. *Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 355 (2011) ("Nothing . . . demands that a trial court first determine whether a party's failure to obey an order has caused another party to suffer prejudice before it may impose a sanction.").

The Mogensens rely upon two cases where we affirmed a trial court's discretion in responding to a late disclosure. In one unpublished case, we affirmed the court's decision to hear testimony from a witness where the Commonwealth failed to disclose *any* witness list but had named its witnesses in voir dire and opening argument. *Pease v. Commonwealth*, No. 0846-22-1, slip op. at 10-11, 2023 Va. App. LEXIS 386, at \*16-17 (June 13, 2023). In the other, we similarly found that a court did not abuse its discretion by admitting a late-disclosed recording of an inculpatory phone call because the defendant had not established prejudice. *Harvey*, 76 Va. App. at 473. Far from establishing that a party must show prejudice to exclude a late-disclosed witness's testimony, these cases merely exhibit the great deference we accord to a trial court's enforcement of a discovery order. And even if prejudice were required, the court below did consider—quite reasonably—that a 2:00 a.m. disclosure the morning before trial would have prejudiced the County. By contrast, the late disclosures admitted in *Pease* and *Harvey* were made before the parties even began their cases-in-chief. *Pease*, slip op. at 2-3, 2023 Va. App. LEXIS 386, at \*2; *Harvey*, 76 Va. App. at 473. For these reasons, the trial court did not err by precluding Gretchen from testifying.

D. The evidence was sufficient to sustain the jury's findings of cruelty or inadequate care for each animal.

Finally, the Mogensens argue that the evidence was insufficient as a matter of law to sustain the jury's findings of cruelty or inadequate care for each of the 71 animals awarded to the County: 1 green Burmese python, 2 ball pythons, 3 Aldabra tortoises, 7 Sulcata tortoises, 4 red-foot tortoises, 5 red-eared slider tortoises, 1 painted turtle, 1 blue-tongued skink,[7] 1 female

---

[7] Any claims as to the skink are moot because the skink died shortly after seizure. *Berry v. Bd. of Supervisors of Fairfax Cnty.*, 302 Va. 114, 129 (Va. 2023) (explaining that an action is moot when "changing events during litigation . . . make it impossible for a court to award a litigant the relief requested").

gibbon, 12 white-throated capuchins, 5 brown capuchins, 6 cotton-topped tamarins, 14 macaws, 3 ground hornbills, 4 giraffes, 1 mini donkey, and 1 dog.

While this is a civil proceeding, the Commonwealth must nevertheless "prove its case beyond a reasonable doubt." Code § 3.2-6569(E). Therefore, we review this sufficiency of the evidence challenge in the same way we would review a challenge to a criminal conviction using the same standard of proof. "When the sufficiency of the evidence is challenged on appeal, we review the evidence 'in the light most favorable to the [government], granting to it all reasonable inferences fairly deducible therefrom.'" *Settle*, 55 Va. App. at 215 (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 276 (2004)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established [the elements] beyond a reasonable doubt.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (first alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the [charge] beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). Thus, the reviewing court must assess whether there is sufficient evidentiary support for the determination of animal cruelty or neglect. *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018).

To seize an animal from the Mogensens, the County needed to prove, beyond a reasonable doubt, that the animal was either (i) cruelly treated or (ii) deprived of adequate care to the point of posing a direct and immediate threat to the animal's life, safety, or health. Code § 3.2-6569(F). The County argued below and again on appeal that both conditions were met as to each animal. Likewise, the court instructed the jury on both cruel treatment and inadequate care. Specifically, the court instructed the jury that ill treatment constituted "cruel treatment." As the Mogensens agreed, if the evidence showed cruelty, the County did not have to prove a

- 11 -

direct and immediate threat to the animal's life, safety, or health. The direct and immediate threat element applied if the evidence showed *only* inadequate care. *Id*.

Because cruel treatment is the lower threshold, we consider here only whether there is any evidentiary support for a finding of cruel treatment. In defining cruel treatment, the circuit court instructed the jury that "[c]ruelly treated means any person who ill-treats any animal whether belonging to himself or another." The Mogensens did not object to this instruction, and so we will consider only whether the evidence was sufficient to show ill-treatment of the animals. *See Smith v. Commonwealth*, 296 Va. 450, 461 (2018) ("[I]nstructions given without objection become the law of the case and thereby bind the parties in the trial court and this Court on review." (quoting *Wintergreen Partners, Inc. v. McGuireWoods, LLP*, 280 Va. 374, 379 (2010))).

The County presented evidence of ill-treatment in three basic categories. First, the County provided general evidence about the Zoo and its operations, policies, and procedures (e.g., that the Zoo had no ventilation system). Second, the County produced evidence about the conditions in which various animals were living—including long-term conditions (e.g., inappropriately small enclosures, dangerously placed enclosures, inappropriate temperature and humidity conditions, lack of UV light, inadequate ventilation) and more transitory conditions (e.g., filthy cages, lack of enrichment). This evidence included thousands of photographs. Third, the County's witnesses discussed particularized evidence of the condition of the animals themselves.

At the close of argument, the Mogensens moved to strike on the basis that the County presented insufficient evidence by relying on witness testimony that was undermined or contradicted on cross-examination. Counsel for the Mogensens recited the contradictory testimony by category of allegation, declining the court's offer to review the evidence animal-by-

animal.  In their appellate briefs, the Mogensens again organize their arguments by type of allegation rather than by individual animal.  We proceed by considering the evidence as it pertains to each category of animal.

The macaws.  The jury learned from veterinary doctors that the macaws had missing toes and broken nails, which doctors attributed to the broken wires in their enclosures.  They also exhibited visible feather loss and bruising, likely due to a poor diet or stress.  Their enclosures were filthy with feces and urine and lacked adequate ventilation.

The hornbills.  Several hornbills suffered from injuries: one had a broken upper beak and abrasions on his wing; another was missing part of his upper beak and part of one wing.  Another one was so thin that it was "starving close to death."  They were housed at an improper temperature without any UV light.

The giraffes.  Several experts testified that all four giraffes suffered from hoof overgrowth, which forces giraffes to change the way they walk and causes discomfort of the hooves and legs.  The male, for example, demonstrated a behavior called "paddling" that is a "clear physical behavioral indicator[] of discomfort," and the females also displayed gait changes.  They all lacked proper enrichment, and the County veterinarian lamented that she found more records about breeding the giraffes than about managing their health.

The tortoises.  All 14 tortoises had respiratory issues caused by filthy enclosures coupled with poor ventilation and possibly inadequate temperature and light conditions.  The Aldabra tortoises' enclosure had a puddle of urine that had "run off from the capuchin monkeys." Likewise, the Sulcata tortoises were housed under the tropical birds such that the birds' feces fell onto them and into their enclosure.  The Red-foot tortoises had a heat mat in their enclosure that was set to a temperature capable of causing them thermal burns.

The turtles.  A number of turtles had signs of internal infection or sepsis and one had pneumonia.  What's more, although turtles are "primarily aquatic" animals, their pool was too shallow for them to fully submerge.  And the dirty pool was their only source of drinking water, which an expert likened to "drinking out of the sewer."

The capuchins.  A veterinary doctor testified that the capuchins were fighting for space inside their inappropriately small and inadequately lit enclosures.  One brown capuchin had a mineral imbalance caused by UV light deprivation and an inappropriate diet.  All brown capuchins were so thin that their hip bones were showing.  The white-throated capuchins exhibited varying levels of dental disease, including one female whose tooth infection had "ruptured through . . . the bone."

The pythons.  The jury heard testimony that poor husbandry (e.g., inadequate humidity, inappropriately cold temperature) caused the pythons to shed abnormally (dysecdysis).  Their enclosure contained days-old feces.  Furthermore, the Burmese python exhibited a fractured rib, and a ball python suffered from a respiratory illness.

The gibbon and tamarins.  The gibbon lived alone in her inappropriately small, poorly lit enclosure.  She exhibited stress behaviors like thumb sucking and gastrointestinal issues like diarrhea.  She also tested positive for tuberculosis.  Likewise, the tamarins were housed improperly.  The male was pacing and over-grooming, likely because he lived alone with no enrichment.  The five females, on the other hand, were overcrowded in an enclosure visibly smaller than the minimum size of 15 feet by 15 feet by 30 feet.  Their diets seemed devoid of fruit—something they need in high contents.

The mini donkey.  A veterinary doctor testified to the mini donkey's several health issues, including internal parasites and hoof overgrowth.  His face was visibly swollen due to

food that had compacted in "two areas in his premolars." The veterinarian also worried that he was housed in an enclosure overcrowded with llamas—animals much larger than he.

The dog. The dog was housed outside in an area enclosed by a gate and chicken wire. A veterinarian testified that the dog could "easily injure herself" by jumping over the gate or running into the chicken wire. Also, the enclosure contained no shelter where the dog could escape the cold, wind, rain, or snow, which the veterinarian observed herself when visiting on a "very windy," below-freezing day.

While there is more evidence of cruel treatment for the first categories of animals listed above, there is at least some direct evidence of inadequate care for each animal, including those at the bottom of our list. What is more, the overall lack of care for so many animals at the zoo provides additional evidence that the tamarins, donkey, and dog were also ill-treated. The general animal care method and plan at the Zoo was clearly lacking, and the jury was entitled to count that as relevant evidence supporting the cruel treatment of each individual animal. *See Cheripka v. Commonwealth*, 78 Va. App. 480, 495 (2023) (holding that evidence of other wrongful acts may be considered when they show "'the conduct or attitude of the accused toward his victim[;]' . . . or shows motive, method, intent, plan or scheme, or any other relevant element of the offense on trial." (alterations in original) (quoting *Ortiz v. Commonwealth*, 276 Va. 705, 714 (2008))).

The jury carefully considered each animal, concluding that many had not been cruelly treated. As for the 71 animals that the jury found had been cruelly treated, we find there is sufficient evidentiary support to the determination of animal cruelty, and so we affirm.

CONCLUSION

For these reasons, we affirm the judgments of the circuit court.

*Affirmed.*

- 15 -